**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-2167**

DENNIS FUSARO,

Plaintiff – Appellant,

v.

MEMBER MICHAEL R. COGAN, Maryland State Board of Elections; MEMBER EMMET C. DAVITT, Maryland State Board of Elections; MEMBER PATRICK J. HOGAN, Maryland State Board of Elections; MEMBER KELLEY A. HOWELLS, Maryland State Board of Elections; MEMBER GLORIA LAWLAH, Maryland State Board of Elections; MEMBER DAVID J. MCMANUS, JR., Maryland State Board of Elections,

Defendants – Appellees.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Ellen L. Hollander, District Judge. (1:17-cv-03582-ELH)

Argued: March 20, 2019                                      Decided: July 12, 2019

Before GREGORY, Chief Judge, and KING and FLOYD, Circuit Judges.

Vacated and remanded by published opinion. Judge King wrote the opinion, in which Chief Judge Gregory and Judge Floyd joined.

**ARGUED:** Stephen Ralph Klein, PILLAR OF LAW INSTITUTE, Washington, D.C., for Appellant. Andrea William Trento, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. **ON BRIEF:** Brian E. Frosh,

Attorney General, John R. Grimm, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.

———————————

KING, Circuit Judge:

Plaintiff Dennis Fusaro, a Virginia resident, challenges § 3-506 of Maryland's Election Law, which regulates access to Maryland's list of registered voters (the "List"). Section 3-506 provides, inter alia, that the State Board of Elections shall provide copies of the List only to registered Maryland voters, and confines use of the List to purposes related to the electoral process. After Fusaro was denied a copy of the List because he was not a registered Maryland voter, he sued the defendant state officials in the District of Maryland, alleging that § 3-506 violates the Free Speech Clause of the First Amendment and that the provision's reference to the "electoral process" is unconstitutionally vague. Fusaro sought a preliminary injunction barring enforcement of § 3-506 as to its registered voter requirement and its restrictions on use of the List. The district court dismissed Fusaro's complaint and denied injunctive relief on the ground that Fusaro had no First Amendment right to access the List. As explained below, we are satisfied that, with respect to his free speech challenge, Fusaro has stated a claim under the First Amendment. We therefore vacate and remand for further proceedings.

I.

A.

Plaintiff Dennis Fusaro is a resident of and registered voter in Stephens City, Virginia. Fusaro has worked for a number of regional and national political campaigns, and intends to "continue his involvement in elections and political advocacy," including in Maryland. *See Fusaro v. Davitt*, No. 1:17-cv-03582 at ¶¶ 16-17 (D. Md. Dec. 4,

3

2017), ECF No. 1 (the "Complaint"). In 2014, Fusaro consulted for a successful campaign for a County Council seat in Anne Arundel County, Maryland. In 2016, Fusaro was charged by the state prosecutor with violating criminal provisions of Maryland's Election Law in connection with his work in the 2014 campaign. *Id.* ¶ 1 (citing *State v. Fusaro*, D-07-CR-16-00734 (D. Ct. Anne Arundel Co.)); *see also Fusaro v. Davitt*, No. 1:17-cv-03582 (D. Md. Dec. 4, 2017), ECF No. 20-2 (criminal information filed in Fusaro's prosecution).[1]

In February 2017, Fusaro was convicted of the alleged Election Law violations after a bench trial in Maryland state court. In August 2017, however, Fusaro obtained a new trial before a jury and was acquitted. Following those events, Fusaro sought to express his displeasure with the state prosecutor by "shar[ing] his story with Maryland citizens" and urging them to seek the prosecutor's resignation. *See* Complaint ¶ 2. Fusaro planned to achieve his goal — that is, the prosecutor's resignation — by mailing copies of a letter criticizing the prosecutor to registered Maryland voters.

The object of Fusaro's displeasure was defendant Emmett C. Davitt, the Maryland State Prosecutor at all relevant times.[2] The State Prosecutor possesses statutory authority

---

[1] This Court takes judicial notice of the state court documents relating to Fusaro's prosecution, as the district court properly did. *See Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239-40 (4th Cir. 1989) (confirming propriety of judicially noticing court records on motion to dismiss and noticing guilty plea in state court).

[2] Although the caption of this case reflects that Fusaro sued Davitt in his official capacity as a member of the State Board of Elections, Davitt does not appear to have ever held such a position. Instead, as the Complaint correctly explains, Davitt was the (Continued)

4

to investigate and prosecute violations of Maryland law. *See* Md. Code Crim. P. §§ 14-107(a), 14-109(a). The State Prosecutor is appointed by the Governor of Maryland, with the advice and consent of the Maryland Senate. *Id*. § 14-102(c)(1). It is not an elected office.

To facilitate his letter campaign against Davitt, Fusaro sought a copy of Maryland's list of registered voters. The List is maintained by the Maryland State Board of Elections (the "State Board"). *See* State Board, *Voter Registration Statistics*, https://elections.maryland.gov/voter_registration/stats.html. According to the State Board, the List contains the names, addresses, party affiliation, and other personal data of the nearly four million voters registered in Maryland. *See* Complaint ¶¶ 3-4; *see also* State Board, *Eligible Active Voters on the Precinct Register – By County* (Oct. 20, 2018), https://elections.maryland.gov/press_room/2018_stats/GG18_Eligible_Active_Voters_by _County.pdf; State Board, *Application for Voter Registration Data*, https://elections.maryland.gov/pdf/SBEAPPL.pdf.[3] Fusaro planned to use the List to circulate his letter criticizing Davitt and urge Maryland voters to seek his resignation, notwithstanding that Davitt holds an appointed (rather than elected) office.

---

Maryland State Prosecutor who supervised Fusaro's prosecution for violations of that state's Election Law. *See* Complaint ¶ 10.

[3] We take judicial notice of the State Board's documents describing the List as matters of public record. *See Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015) (approving judicial notice of "matters of public record").

5

Pursuing his plan, Fusaro applied for a copy of the List from the State Board in August 2017. The Board promptly rejected Fusaro's application because he did not satisfy the statutory requirements to obtain a copy of the List. The statutory provisions concerning the maintenance and distribution of the List are codified in Subtitle 5 of Title 3 of Maryland's Election Law. Section 3-506 governs the dissemination of copies of the List and provides as follows:

> (a) (1) A copy of a list of registered voters shall be provided to a Maryland registered voter on receipt of:
>
> > (i)  a written application; and
> > (ii) a statement, signed under oath, that the list is not intended to be used for:
> >
> > > 1. commercial solicitation; or
> > > 2. any other purpose not related to the electoral process. [ . . . ]
>
> (c) A person who knowingly allows a list of registered voters, under the person's control, to be used for any purpose not related to the electoral process is guilty of a misdemeanor and, on conviction, is subject to the penalties under Title 16 [of the Election Law].

*See* Md. Code Election Law, § 3-506(a), (c). Additionally — and relevant here — § 3-505 of the Election Law makes the voter registration records "open to public inspection" at local offices of the State Board. *Id*. § 3-505(b)(1). Those records may also be removed from the local State Board office "on order of a court," or "for temporary removal solely for purposes of data processing." *Id*. § 3-505(b)(2)(ii).

The State Board's rejection of Fusaro's application for the List complied with § 3-506. Fusaro's application included his home address in Virginia. Thus, as the Board explained in its subsequent correspondence with Fusaro, it rejected his application

6

because, under § 3-506, "you must be a Maryland resident and registered voter to request a copy of the voter registration list." *See* Complaint, Ex. D. Confirming the State Board's written explanation, Fusaro's rejected application contains a notation from the Board indicating that the rejection was based on the fact that Fusaro was not a registered Maryland voter. Fusaro does not allege or identify any other reason for the Board's rejection of his application. Notably, the Complaint does not indicate that Fusaro has ever sought to obtain Maryland voter registration records from a local office of the State Board. Nor does Fusaro allege that he intends to seek Maryland residency and register as a Maryland voter. Fusaro acknowledges that, pursuant to Maryland law, he is not entitled to register to vote in Maryland as long as he remains a resident of Virginia. *Id.* ¶ 4 (citing Md. Code Election Law § 3-102(a)(1)(iii)).

B.

Fusaro sued Davitt and various members of the State Board in the District of Maryland on December 4, 2017. Fusaro's Complaint alleges two challenges against § 3-506. The Complaint first alleges that providing copies of the List only to registered Maryland voters contravenes the Free Speech Clause of the First Amendment because it favors "some political speakers" over others, namely, anyone not registered to vote in Maryland (Count I). *See* Complaint ¶ 30. Second, the Complaint alleges that the prohibition against using the List for any purpose "not related to the electoral process" restricts speech based on content and is unconstitutionally vague, in violation of the First and Fourteenth Amendments (Count II). The Complaint presents each count as both facial and as-applied challenges, and it seeks declaratory and injunctive relief. As

7

attachments to the Complaint, Fusaro included his proposed letter urging Maryland voters to seek Davitt's resignation; his rejected application for the List; and his correspondence with the Board regarding that rejection.

Shortly thereafter, on December 15, 2017, Fusaro requested a preliminary injunction from the district court. Specifically, Fusaro sought to bar enforcement of the portions of § 3-506 that limit access to the List to registered Maryland voters only, and that prohibit using the List for purposes unrelated to the electoral process. In response, the defendants filed a consolidated memorandum on January 26, 2018, which included a motion to dismiss the Complaint and their opposition to Fusaro's request for a preliminary injunction.

On September 4, 2018, the district court granted the defendants' motion to dismiss and denied Fusaro's request for a preliminary injunction. *See Fusaro v. Davitt*, No. 1:17-cv-03582 (D. Md. Sept. 4, 2018), ECF No. 26 (the "Opinion"). The Opinion rejected Fusaro's challenge to § 3-506 as a violation of the Free Speech Clause. Instead, the Opinion determined that § 3-506 merely regulated access to a record created and maintained by the government of Maryland. Relying primarily on the Supreme Court's decisions in *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978), and *Los Angeles Police Department v. United Reporting Publishing Corporation*, 528 U.S. 32 (1999), the Opinion ruled that Fusaro had no First Amendment right of access to such government information. *See* Opinion 25-26. Because both counts of the Complaint were predicated on the proposition that Fusaro had a First Amendment right to the List, the Opinion dismissed the Complaint in its entirety and denied injunctive relief. Fusaro has timely

8

appealed the judgment and we possess appellate jurisdiction pursuant to 28 U.S.C. § 1291.[4]

II.

This Court reviews de novo a dismissal under Federal Rule of Civil Procedure 12(b)(6). *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). In conducting such a review, we assume all well-pleaded facts are true and draw all reasonable inferences in favor of the plaintiff. *Id.* Viewing the complaint in that light, a plaintiff must plead "sufficient factual matter" to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). We will consider documents attached to the complaint, "as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). And we review de novo a district court's rulings on the constitutionality of statutory provisions. *See, e.g.*, *Miller v. Brown*, 503 F.3d 360, 364 (4th Cir. 2007). Lastly, we review the denial of a preliminary injunction for abuse of discretion. *See Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011).

---

[4] The district court did not expressly dismiss Fusaro's Complaint with prejudice. *See generally* Opinion; *see also Fusaro v. Davitt*, No. 1:17-cv-3582 (D. Md. Sept. 4, 2018), ECF No. 27 (order granting defendants' motion to dismiss). But the Opinion makes clear "that amendment of the complaint could not cure its defects," because — in the court's view — Fusaro was alleging a nonexistent right. *See Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 345 (4th Cir. 2005). And the court's accompanying order directed the Clerk to close the case. Thus, the "specific facts of the case" show that the dismissal of the Complaint is a final decision under 28 U.S.C. § 1291. *Id.* at 345-46.

In so doing, we review factual findings for clear error and assess legal conclusions de novo. *Id.*

## III.

The primary issue presented in this appeal is whether Fusaro's unsuccessful attempt to obtain a copy of the List presents a cognizable First Amendment claim. The district court determined that Fusaro's claims amounted to nothing more than an alleged First Amendment right to access a government record. The Opinion explained that, as a general matter, no such right exists — at least, not under the circumstances alleged — and the court dismissed the Complaint on that basis. Fusaro maintains, however, that § 3-506 burdens speech by limiting access to the List and the purposes for which the List may be used, in contravention of the First Amendment. We must assess whether Fusaro's alleged injury is protected by the Free Speech Clause of the First Amendment, and, if so, the level of scrutiny that applies to the challenged provisions of § 3-506. We will then address Fusaro's vagueness challenge, as well as his request for a preliminary injunction.

### A.

The Free Speech Clause of the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." *See* U.S. Const. amend. I. The Free Speech Clause applies to the states by way of the Fourteenth Amendment. *See Snyder v. Phelps*, 580 F.3d 206, 214 n.4 (4th Cir. 2009) (citing *Stromberg v. California*, 283 U.S. 359, 368 (1931)). That short but forceful phrase has given rise to a complex array of legal protections for free expression, which the courts have flexibly applied in a variety

10

of circumstances. Those precedents establish that the First Amendment protects speech along a spectrum, so that "[l]aws that impinge upon speech receive different levels of judicial scrutiny depending on the type of regulation and the justifications and purposes underlying it." *See Stuart v. Camnitz*, 774 F.3d 238, 244 (4th Cir. 2014).

At one end of the applicable spectrum, "regulations that discriminate against speech based on its content are presumptively invalid" and are usually subject to strict scrutiny. *See Stuart*, 774 F.3d at 244 (internal quotation marks omitted). That is, such regulations must be "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end." *See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991). "Laws that burden political speech" are also generally subject to strict scrutiny. *See Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011). Further down the spectrum, "areas traditionally subject to government regulation, such as commercial speech and professional conduct, typically receive a lower level of review." *See Stuart*, 774 F.3d at 244 (internal quotation marks and alterations omitted). Within that spectrum, the federal courts have employed various multi-factor tests designed to achieve an "intermediate" level of review that can be sensibly applied in a range of contexts. *See, e.g.*, *id.* at 249-50 (applying "heightened intermediate level of scrutiny" to statute that incorporated both content-based speech restriction and "regulation of the medical profession").

In this appeal, the first issue we must resolve is whether the district court erred in ruling that § 3-506 does not implicate the First Amendment right to free speech. That is, we must determine whether Fusaro's claims fall anywhere on the spectrum of First

11

Amendment speech protections. Our answer to that question turns on the framing of Fusaro's claims. On the one hand, the district court concluded that § 3-506 merely regulates access to a government record, and such access is not generally protected by the First Amendment. The defendants urge us to affirm that view of Fusaro's claims and dismiss the Complaint on that basis.

On the other hand, Fusaro contends that the List is a powerful communications tool, closely tied to political speech. Because the List facilitates speech directed to Maryland voters, it impacts the circulation of information and ideas to those voters. According to Fusaro, the limitations on access to and use of the List contained in § 3-506 constitute a burden on protected speech and must comply with the First Amendment. Fusaro also contends that § 3-506 should be subject to strict scrutiny — the most exacting test applicable under the Free Speech Clause — because § 3-506 imposes a "severe" burden on speech and discriminates based on its content. *See* Complaint ¶¶ 32, 38. In sum, the parties offer sharply opposing characterizations of Fusaro's claims.

As explained herein, we are satisfied that § 3-506 must comply with the protections enshrined in the Free Speech Clause. Accordingly, Fusaro's claim that § 3-506 unconstitutionally restricts speech is cognizable under the First Amendment. That said, the context and nature of § 3-506 urge judicial deference to the judgment of Maryland's legislature in crafting that statute, and they inform the level of scrutiny that applies thereto.

1.

As the Opinion correctly recognized, there is no general First Amendment right to access a government record. The Supreme Court has ruled that the First Amendment does not "guarantee the public a right of access to information generated or controlled by government." *See Houchins v. KQED, Inc.*, 438 U.S. 1, 16 (1978) (Stewart, J., concurring in the judgment).[5] And the appellate courts have complied with that principle in various contexts. *See, e.g.*, *Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 934 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 1104 (2004) (applying *Houchins* and rejecting asserted right to access government records concerning detained terrorism suspects). Although a narrow exception exists with respect to a "limited First Amendment right of access" to criminal proceedings, that exception has no bearing on Fusaro's claims. *See id.* (citing, inter alia, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575-77 (1980)). The general rule is that of *Houchins*: there is no First Amendment right "to government information or sources of information within the government's control." *See* 438 U.S. at 15 (plurality opinion). Rather, the decision to make government information available to the public is generally a "question of policy" for the "political branches." *See id.* at 12, 16; *see also Capital Cities Media, Inc. v.*

_____

[5] *Houchins* was decided by seven members of the Supreme Court. Chief Justice Burger wrote the plurality opinion. Justice Stewart's concurrence is recognized as having controlling effect as the narrowest prevailing vote. *See Marks v. United States*, 430 U.S. 188, 193 (1977). Justice Stewart "agree[d] substantially" with the Chief Justice that the First Amendment confers no general right of access to government documents. *See Houchins*, 438 U.S. at 16. He wrote separately to emphasize that, in some circumstances, the press might merit additional solicitude in its information-gathering efforts to which the general public would not be entitled. *Id.*

13

*Chester*, 797 F.2d 1164, 1167-71 (3d Cir. 1986) (surveying precedent and history and concluding that decision to disclose government information belongs to political branches).

On its face, Fusaro's request for a copy of the List falls under the general rule of *Houchins*. The List is a record of the personal information of Maryland voters that is compiled, controlled, and maintained by the government of Maryland. Ordinarily, there is no First Amendment right to such a record. Thus, there is generally no First Amendment claim based on the government's denial of access to such information. *See Houchins*, 438 U.S. at 16; *see also L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 40 (1999) (rejecting facial First Amendment challenge based on "governmental denial of access to information in its possession").[6]

Nevertheless, three important considerations compel our conclusion that § 3-506 implicates interests that are protected by the First Amendment. First, the List is closely tied to political speech, which generally receives the strongest First Amendment protection. Second, § 3-506 imposes content- and speaker-based conditions on access to and use of the List, and such restrictions are typically subject to heightened scrutiny. Third, Supreme Court precedent indicates that suspect conditions on access to government information may be subject to First Amendment scrutiny. That precedent leads us to conclude that the conditions that § 3-506 imposes with respect to the List

---

[6] The various states and the federal government may, of course, create statutory rights to information. As *Houchins* made clear, however, the "Constitution itself" is not a "Freedom of Information Act." *See* 438 U.S. at 14 (plurality opinion).

14

present a sufficient risk of improper government interference with political speech that it is susceptible to being challenged under the Free Speech Clause.

a.

As a threshold matter, the nature of the government records to which § 3-506 governs access informs our analysis of the First Amendment implications. Importantly, the List materially differs from the government information at issue in the Supreme Court's decisions in *Houchins* and *United Reporting*. *Houchins* addressed a broadcaster's effort to inspect a California county jail in order to report on prisoner conditions. *See* 438 U.S. at 3-5. And in *United Reporting*, a publishing company wanted to obtain the Los Angeles Police Department's records of arrestees' addresses. *See* 528 U.S. at 34. The information sought by the plaintiffs in those two situations lacked any direct relationship to political speech, let alone an explicit connection to "the electoral process." *See* Md. Code Election Law, § 3-506(a)(1)(ii)(2). Likewise, our sister circuits have never applied *Houchins* and *United Reporting* to circumstances where the requested government information was closely tied to political speech. *See, e.g.*, *Travis v. Reno*, 163 F.3d 1000, 1007 (7th Cir. 1998) (applying *Houchins* to conclude that First Amendment did not create right to access motor vehicle records).

By contrast, the List is a valuable tool for political speech. The List provides, inter alia, the names, addresses, and party affiliations of registered Maryland voters. That information obviously serves various state interests, such as assisting election officials on election day. *See* Md. Code Election Law, § 3-101(b)(5). The fact that Maryland makes the List publicly available, however, recognizes the common use of such voter data by

15

political groups, advocacy organizations, and others seeking to spread messages or garner support for candidates or causes.[7]  *See, e.g., Green Party of N.Y. v. N.Y. State Bd. of Elections*, 389 F.3d 411, 420 (2d Cir. 2004) (recognizing that political parties use voter registration lists for "activities essential to their exercise of First Amendment rights"). Indeed, the form application for a copy of the List offers access to a "Walking List," a file that identifies each voter at each address and that is "designed for walking up and down the streets."  *See* State Board, *Application for Voter Registration Data* 2, https://elections.maryland.gov/pdf/SBEAPPL.pdf.  In other words, Maryland offers its voter data in a format designed to facilitate canvassing and outreach.

The circulation of political ideas typically receives "the broadest protection" afforded by the First Amendment.  *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) (striking state statute prohibiting distribution of "anonymous campaign literature" and emphasizing that political advocacy "is the essence of First Amendment expression").  And, in addition to the List's obvious practical utility to political expression, § 3-506 all but ensures that the List will be used to further such speech.  More specifically, § 3-506(c) makes it a misdemeanor to use the list "for any purpose not related to the electoral process."  Thus, the text of § 3-506 reinforces the connection between the List and political speech.  In these circumstances, we are obliged to hesitate

---

[7] A brief survey reveals that the fifty states and the District of Columbia make their registered voter lists available in varying degrees.  *Compare, e.g.*, Ala. Code § 17-3-53 (providing registered voter list to political parties and permitting counties to determine further distribution) *with* Ga. Code § 21-2-225 (making list publicly available with certain personal information omitted, and prohibiting commercial use of list).

before placing such a regulation beyond judicial scrutiny. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 195 (2010) (explaining that "the expression of a political view implicates a First Amendment right"); *see also McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 209 (2014) (emphasizing that courts must "err on the side of protecting political speech").

Nevertheless, the First Amendment should not be stretched to cover all regulations that could conceivably affect speech at any distant point on a causal chain. *See, e.g.*, *Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965) (rejecting First Amendment claim challenging travel restrictions to Cuba and warning that "[t]here are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow"). Importantly, "[t]he right to speak and publish does not carry with it the unrestrained right to gather information," including government-held information. *Id.* at 17. The List, however, is sufficiently intertwined with political speech that the provisions concerning its distribution are not immune to constitutional scrutiny. *See Stuart*, 774 F.3d at 245 (applying First Amendment scrutiny to statute regulating both highly protected speech and lesser-protected professional conduct).

Indeed, the Supreme Court has recognized that burdening a means of communication can burden speech. The connection between "indispensable instruments of effective political speech" and speech itself led the Court to rule that campaign spending limits must satisfy strict scrutiny. *See Buckley v. Valeo*, 424 U.S. 1, 19, 23 (1976). That said, access to the List presents a less immediate link to political speech than does campaign spending. And it is important that the List is a government record, so that regulations on its distribution reflect policy judgments to which courts must

17

ordinarily defer.  In other words, requesting and obtaining a copy of the List is not purely an act of speech, in that it is not simply a matter of personal expression, nor of the use of private resources to aid such expression.  But the Court's precedents favoring the protection of political speech in various forms support the conclusion that the List's connection to such speech favors some level of First Amendment protection.

b.

The second aspect of § 3-506 that implicates the Free Speech Clause is the nature of the conditions it places on the List.  Specifically, § 3-506 restricts access to and use of the List based on the identity of the speaker requesting the List and the content of the speaker's message.  In other contexts, restrictions of that kind can trigger strict scrutiny.  Although the presence of such restrictions does not require that we apply strict scrutiny in the novel context of access to voter registration data, it supports some measure of First Amendment protection.

In general, the Free Speech Clause "prohibits a restriction on speech that is predicated on its message, its ideas, its subject matter, or its content." *See Am. Ass'n of Political Consultants, Inc. v. Fed. Commc'ns Comm'n*, 923 F.3d 159, 163 (4th Cir. 2019) (internal quotation marks omitted).  And such content-based restrictions "are presumptively unconstitutional and are only permissible if they satisfy strict scrutiny review." *Id*. (internal quotation marks omitted).  Likewise, speaker-based restrictions combined with content-based restrictions are frequently deemed to be constitutionally suspect. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015) (emphasizing that "laws favoring some speakers over others demand strict scrutiny when the legislature's

speaker preference reflects a content preference"). The heightened scrutiny that ordinarily applies to such restrictions reflects the First Amendment's essential purpose of ensuring an "unfettered interchange of ideas," free of undue government interference. *See Meyer v. Grant*, 486 U.S. 414, 421 (1988) (internal quotation marks omitted).

Section 3-506 incorporates both content- and speaker-based restrictions. First, it authorizes the distribution of copies of the List to a single group of speakers (registered Maryland voters) while denying copies to another group of speakers (anyone *not* registered to vote in Maryland). *See* Md. Code Election Law, § 3-506(a)(1). Section 3-506 then limits the use of the List to purposes "related to the electoral process." *Id.*, § 3-506(a)(1)(ii). As innocuous as that restriction may appear, it nevertheless "singles out specific subject matter for differential treatment," which will ordinarily trigger an application of heightened scrutiny. *See Town of Gilbert*, 135 S. Ct. at 2230. Importantly, the practical operation of § 3-506 is to limit use of the List to political speech, and then restrict the pool of speakers with access to an effective means of communicating that speech. Supreme Court precedent concerning First Amendment protections for political speech compel the meaningful scrutiny of a statute with such an effect. *See, e.g.*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) (rejecting argument that, "in the context of political speech, the Government may impose restrictions on certain disfavored speakers").

We recognize that content- and speaker-based conditions on accessing and using government information have not heretofore been relied on to overcome the general principle that there is no First Amendment right to such information. And courts rightly

19

should hesitate before intruding into areas — like the disclosure of government information — that depend on policy considerations reserved to the political branches. *See Houchins*, 438 U.S. at 14-15 (emphasizing that "access to particular government information" is a policy question for which "Congress may provide a resolution"). But neither the Supreme Court in *Houchins* nor any appellate court applying that decision has been faced with a situation where the government provided information only to a discrete group for limited purposes, let alone in an overtly political context. By contrast, § 3-506 imposes content- and speaker-based restrictions on access to and use of information closely tied to political speech. As a result, § 3-506 extends into an area where the courts may properly weigh in on the decisions of policymakers. *See, e.g., Buckley v. Am. Constitutional Law Found. Inc.*, 525 U.S. 182, 192 (1999) (explaining that First Amendment requires courts "to guard against undue hindrances to political conversations and the exchange of ideas").

c.

Lastly, and importantly, the Supreme Court has strongly signaled that certain types of conditions on access to government information may be subject to First Amendment scrutiny. We refer to the *United Reporting* decision, the only controlling precedent to assess a statute that imposed conditions on access to and use of government information. Although the majority opinion in *United Reporting* sustained the statute at issue — in materially different circumstances — the writings of eight justices indicate that some conditions on the disclosure of government information can run afoul of the Free Speech Clause, giving rise to a viable constitutional claim.

20

The majority opinion in *United Reporting* rejected a facial challenge to a California statute that placed two conditions on access to police records of arrestees' addresses: first, the requester had to declare that the records would be used for one of five approved purposes; and, second, the requester had to declare that the addresses would not be used to sell a product or service. *See* 528 U.S. at 34. The majority ruled that, "at least for purposes of facial invalidation," the facts reflected "nothing more than a governmental denial of access to information" with respect to a plaintiff that had not sought to qualify for access under the statute. *Id*. at 40. Absent a threat of prosecution or some other material risk that speech would be chilled, the plaintiff could not maintain a facial challenge in those circumstances. *Id*. at 40-41.

That brief summary readily reveals two material differences between the facts of *United Reporting* and those here. First, the *United Reporting* majority addressed only a facial challenge, and it left open the possibility that the plaintiff could assert a viable as-applied challenge on remand. *See* 528 U.S. at 41. Fusaro, by contrast, pursues both facial and as-applied challenges, and he alleges that § 3-506 has burdened his speech, not least because it provides for criminal prosecution of anyone who misuses the List. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 569 (2011) (distinguishing *United Reporting* because, inter alia, plaintiffs pursued as-applied challenge alleging that Vermont statute "burden[ed] their own speech"). Second, neither *United Reporting* nor any other precedent has addressed a request for a government document as closely tied to political speech as is the List. Beyond those distinctions, however, *United Reporting* provides

21

affirmative support for a First Amendment challenge to certain types of conditions being placed on the dissemination of government information.

The majority opinion in *United Reporting* did not directly address the legal significance of the conditions that the California statute imposed on access to arrest records. In two concurrences and a dissent, however, eight justices voiced their concern that some conditions on the release of government information could restrict speech. In his concurrence, Justice Scalia (joined by Justice Thomas) expressly reserved the issue of whether a combination of content- and speaker-based conditions on access to government information could constitute a speech restriction subject to First Amendment scrutiny. *See United Reporting*, 528 U.S. at 42 (suggesting that "a restriction upon access that *allows* access to the press . . . but at the same time *denies* access to persons who wish to use the information for certain speech purposes" may constitute a speech restriction). Justice Ginsburg's concurrence (joined by Justices O'Connor, Souter, and Breyer) concluded that selective disclosure of government information was permissible, as long as access was not conditioned on "an illegitimate criterion such as viewpoint." *Id*. at 43. Finally, Justice Stevens — joined in his dissent by Justice Kennedy — agreed with Justice Ginsburg that the government could not deny information "to a small disfavored class" because of their intended use of such information, or because of their viewpoint or political affiliation. *Id*. at 45-46. In sum, as the Court later explained in the *Sorrell* decision, eight justices in *United Reporting* "recognized that restrictions on the disclosure of government-held information can facilitate or burden the expression of potential recipients and so transgress the First Amendment." *See Sorrell*, 564 U.S. at 569.

22

In considering those precedents, our Court is obliged to afford "great weight to Supreme Court dicta." *See Nat'l Labor Relations Bd. v. Bluefield Hosp. Co.*, 821 F.3d 534, 541 n.6 (4th Cir. 2016). And where a majority of the *Sorrell* Court embraced in dicta a position earlier adopted by eight justices in *United Reporting*, "we cannot simply override" that "legal pronouncement." *See McCravy v. Metro. Life Ins. Co.*, 690 F.3d 176, 181 n.2 (4th Cir. 2012); *see also United States v. Fareed*, 296 F.3d 243, 247 (4th Cir. 2002) (following "the *dictum* endorsed by six justices" of the Supreme Court). Here, a majority of the justices in *United Reporting* and *Sorrell* recognized that the government could restrict speech by limiting access to government information. The justices writing separately in *United Reporting* were each concerned that such restrictions could be subject to abuse. Six of them specifically warned of the risk of viewpoint discrimination, which contravenes the First Amendment in any context thus far addressed by the Court. *See, e.g.*, *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) ("The general principle that has emerged . . . is that the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.").

Of course, not all conditions on access to government information will provoke constitutional concerns. As the various opinions in *United Reporting* show, such conditions exist on a spectrum, from the exclusion of commercial uses sustained by the majority, to viewpoint discrimination, which six of the justices agreed would be unconstitutional. *Compare United Reporting*, 528 U.S. at 40 (majority opinion) (rejecting facial challenge to California disclosure statute restricting uses of arrestee

23

addresses), *with id.* at 43 (Ginsburg, J., concurring) (opining that "California could not, for example, release address information only to those whose political views were in line with the party in power"), *and id.* at 46 (Stevens, J., dissenting) (agreeing that disclosure based on viewpoint or political affiliation "would clearly be invalid"). To protect against such abuses, a First Amendment claim that challenges suspect conditions on access to government information must be available, at least where the plaintiff alleges circumstances indicating improper interference with protected speech.

Because of the close connections between the List and political speech, and the combined effect of the content- and speaker-based restrictions governing access to the List under § 3-506, we are satisfied that Fusaro has stated such a claim. That is, in these circumstances, the conditions imposed by § 3-506 constitute a restriction of protected speech that is susceptible to a First Amendment challenge. Accordingly, Fusaro is entitled to pursue his free speech challenges to the restrictions that § 3-506 imposes on access to the List (Count I) and on use of the List (Count II).

d.

To clarify, we do not rule that a First Amendment right to government information exists as a general proposition. We adhere to *Houchins* and the principle that granting access to such information is a decision for the political branches. *See Houchins*, 438 U.S. at 16. But when the government has decided to make certain information available, there are "limits to its freedom to decide how that benefit will be distributed." *See United Reporting*, 528 U.S. at 43 (Ginsburg, J., concurring).

Thus, Maryland could have decided not to release its voter registration list "without violating the First Amendment." *See United Reporting*, 528 U.S. at 40. But when the Maryland legislature decided to make the List publicly available, it could not condition access to the List on any basis whatsoever. We need not now decide if — as *United Reporting* perhaps suggests — some conditions on the release of government information are so innocuous as to fall outside the First Amendment's protection. We conclude only that the List is a means of political communication, and the combined effect of the content- and speaker-based restrictions contained in § 3-506 present a sufficient risk of improper government interference with protected speech that Fusaro may challenge § 3-506 in federal court.[8]

Lastly, even though we have determined that the restrictions in § 3-506 implicate Fusaro's right to free speech — permitting his First Amendment challenge — we emphasize that the gravamen of his claims remains a request for government information. Thus, although § 3-506 must satisfy the First Amendment, the initial decision to release such information remains, fundamentally, a policy choice. *See United Reporting*, 528

---

[8] Nearly fifty years ago, the Supreme Court expressed support for constitutional limits on the government's ability to restrict access to voter registration lists in a summary affirmance of an Equal Protection claim. *See Socialist Workers Party v. Rockefeller*, 314 F. Supp. 984 (S.D.N.Y.), *judgment aff'd*, 400 U.S. 806 (1970). In that case, a three-judge district court panel struck a New York regulation that provided free copies of the state's voter list only to major political parties. The court ruled that the restriction violated the Equal Protection Clause and explained: "The State is not required to provide such lists free of charge, but when it does so it may not provide them only for the large political parties and deny them to those parties which can least afford to purchase them." *Id*. at 996.

25

U.S. at 40; *Houchins*, 438 U.S. at 15-16. And the judgment of the Maryland legislature regarding the release of government information is entitled to substantial deference, particularly where § 3-506 is part of a complex scheme to regulate elections. Those considerations inform the level of scrutiny that applies to § 3-506.

2.

Having concluded that Fusaro has alleged a cognizable First Amendment challenge to the conditions that § 3-506 places on distribution of the List, we will undertake to identify the applicable level of scrutiny. That is, given the spectrum of First Amendment protections applicable to different kinds of speech in varying contexts, what level of scrutiny governs Fusaro's claims? The type of claim that Fusaro pursues — namely, a free speech challenge to conditions that a state has imposed on the release of voter registration data — has apparently never been addressed by any appellate court. In identifying the level of scrutiny that applies to a novel First Amendment claim, we begin by "examin[ing] the type of regulation at issue" and the interests at stake. *See Stuart*, 774 F.3d at 244.

As the foregoing discussion plainly demonstrates, § 3-506 is not easily categorized. On one hand, as we have stressed, it regulates access to a government record, which is not ordinarily subject to any First Amendment constraints. On the other hand, given the List's entanglement with political speech, the combination of content- and speaker-based restrictions imposed by § 3-506 implicates the concern at the heart of the Free Speech Clause, namely, that the government should not quash speech with which it disagrees. *See, e.g.*, *Turner Broadcasting Sys., Inc. v. Fed. Commc'ns Comm'n*,

26

512 U.S. 622, 642 (1994) (emphasizing the danger of regulations that pose a "substantial risk of excising certain ideas or viewpoints from the public dialogue"). That concern typically requires an application of strict scrutiny to a law containing such restrictions. *See id.*

A key consideration, however, is the context in which § 3-506 operates. More specifically, § 3-506 falls squarely within "areas traditionally subject to government regulation," which are accorded a lower level of scrutiny. *See Stuart*, 774 F.3d at 244. Again, the release of government information is such an area because a disclosure decision is fundamentally a policy question. Equally important, § 3-506 is part of a "complex[] election code[]" enacted by the Maryland legislature to regulate federal and state elections, including all the practical and logistical details thereof. *See Storer v. Brown*, 415 U.S. 724, 730 (1974) (emphasizing role of states in providing "comprehensive" electoral regulation). Conducting elections is the constitutional responsibility of the various states, and regulation by the states is necessary if our elections "are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Id.*; *see also Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (emphasizing the Constitution's grant of authority to states to regulate elections) (citing U.S. Const. art. I, § 4, cl. 1). Consequently, the states possess "considerable leeway" in regulating "election processes generally." *See Am. Constitutional Law Found., Inc.*, 525 U.S. at 191.

In light of the foregoing, the Supreme Court has articulated a "flexible standard" to address "a [First Amendment] challenge to a state election law." *See Burdick*, 504

27

U.S. at 434. As the Court first explained in *Anderson v. Celebrezze*, the practical need

for "substantial regulation of elections" means that "[c]onstitutional challenges to specific

provisions of a State's election laws . . . cannot be resolved by any 'litmus-paper test.'"

*See* 460 U.S. 780, 788-89 (1983) (quoting *Storer*, 415 U.S. at 730). Instead, to properly

accommodate the "state's important regulatory interests" while vindicating individual

constitutional rights, *Anderson* instructed the courts to carefully balance those interests:

> [A Court] must first consider the character and magnitude of the asserted
> injury to the rights protected by the First and Fourteenth Amendments that
> the plaintiff seeks to vindicate. It then must identify and evaluate the
> precise interests put forward by the State as justifications for the burden
> imposed by its rule. In passing judgment, the Court must not only
> determine the legitimacy and strength of each of those interests; it also must
> consider the extent to which those interests make it necessary to burden the
> plaintiff's rights.

*Anderson*, 460 U.S. at 789. The Court refined that test in *Burdick v. Takushi*, explaining

that "the rigorousness of our inquiry into the propriety of a state election law depends

upon the extent to which a challenged regulation burdens First and Fourteenth

Amendment rights." *See* 504 U.S. at 434. Thus, a "severe" restriction on those rights

triggers strict scrutiny. *Id.* But if the challenged election law "imposes only 'reasonable,

non-discriminatory restrictions'" on First and Fourteenth Amendment rights, then "'the

State's important regulatory interests are generally sufficient to justify' the restrictions."

*Id.* (quoting *Anderson*, 460 U.S. at 788). Our Court has summarized the combined

*Anderson-Burdick* inquiry as follows:

> In short, election laws are usually, but not always, subject to ad hoc
> balancing. When facing any constitutional challenge to a state's election
> laws, a court must first determine whether protected rights are severely
> burdened. If so, strict scrutiny applies. If not, the court must balance the

28

character and magnitude of the burdens imposed against the extent to which the regulations advance the state's interests in ensuring that "order, rather than chaos, is to accompany the democratic processes."

*See McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 (4th Cir. 1995) (quoting *Storer*, 415 U.S. at 730).

Although the *Anderson-Burdick* test has generally been applied to claims concerning ballot access, its careful balancing of the very interests implicated by Fusaro's claim leads us to "borrow" that standard for Fusaro's challenge to § 3-506. *See Stuart*, 774 F.3d at 248 (concluding that "confluence" of divergent First Amendment interests urged "borrowing" intermediate scrutiny standard). That is, Fusaro's claim obliges us to resolve the tension between the deference that the courts owe to legislatures in areas meriting careful regulation and the need to protect "fundamental" First Amendment rights, which is the precise balancing required by the *Anderson-Burdick* analysis. *See Anderson*, 460 U.S. at 788. Indeed, the only federal court that we have identified as addressing a First Amendment challenge to state restrictions on access to a voter registration list also applied that balancing test. *See Libertarian Party of Ind. v. Marion Cty. Bd. of Voter Registration*, 778 F. Supp. 1458, 1459-63 (S.D. Ind. 1991) (applying *Anderson* to Indiana law that provided copies of voter registration list only to Republican and Democratic parties and not to minor political parties).

We recognize that the close connection between voter registration lists and political speech may, in some contexts, urge an application of strict scrutiny. But the purpose of the *Anderson-Burdick* test is to ensure that the courts carefully balance all the interests at stake, recognizing that "there is no substitute for the hard judgments that must

29

be made." *See Anderson*, 460 U.S. at 789. Additionally, our Court and the Supreme Court have each distinguished between laws that, on the one hand, regulate "pure speech," and those that, by contrast, are a step removed from direct acts of communication, with the latter receiving more flexible treatment. *See McIntyre*, 514 U.S. at 345 (distinguishing "regulation of pure speech" from "ordinary election restriction"); *Kendall v. Balcerzak*, 650 F.3d 515, 525 (4th Cir. 2011) (applying intermediate scrutiny to referendum signature regulation because it was "a 'step removed from the communicative aspect of petitioning'") (quoting *John Doe No. 1*, 561 U.S. at 213 (Sotomayor, J., concurring)). That distinction is particularly relevant in light of *Burdick*'s warning that "to subject every voting regulation to strict scrutiny" would "tie the hands of States seeking to assure that elections are operated equitably and efficiently." *See* 504 U.S. at 433. Moreover, the *Anderson-Burdick* test provides for the application of strict scrutiny in an appropriate case, that is, when an election regulation severely burdens First and Fourteenth Amendment rights. *See Burdick*, 504 U.S. at 434. We will thus address the question of whether strict scrutiny applies to § 3-506.[9]

---

[9] One further consideration weighs against the uniform application of strict scrutiny to claims for access to government information. The First Amendment favors the "unfettered interchange of ideas," that is, more speech rather than less. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). Because the government has no constitutional obligation to release information in its possession, caution is warranted in creating rules that might discourage disclosure. That is, a flexible test that can accommodate reasonable conditions on disclosure may avoid incentivizing the government to decline to release information altogether. *See United Reporting*, 528 U.S. at 43-44 (Ginsburg, J., concurring) (observing that "society's interest in the free flow of information might argue for upholding [reasonable conditions on the release of (Continued)

3.

The threshold question of the *Anderson-Burdick* framework asks whether the challenged regulation "severely" burdens First and Fourteenth Amendment rights. *See McLaughlin*, 65 F.3d at 1220. Considering the context of § 3-506 and its effect on free speech, it is clear that § 3-506 does not severely burden those rights.[10] We are satisfied that the resolution of Fusaro's claims turns on the balancing of interests described in the *Anderson-Burdick* framework's subsequent steps, which we leave to the district court.

a.

Precedents of the Supreme Court and our Court provide guidance as to what constitutes a "severe" burden on First Amendment rights. The Supreme Court's *Burdick* decision addressed a challenge to Hawaii's regulations for the placement of a candidate on that state's ballot. *See* 504 U.S. at 430. The *Burdick* Court consulted the relevant provisions of Hawaii's election law to conclude that Hawaii's overall "system" provided for "easy access to the ballot" until the nomination deadline, and thus imposed only a "limited" burden. *Id*. at 436-37. That decision also relied on the Court's precedent in *Storer* to conclude that the interest in making a "late rather than an early decision" to seek ballot placement deserved "little weight." *Id*. *Storer* itself urged consideration of the

_____

information] rather than imposing an all-or-nothing regime under which 'nothing' could be a State's easiest response").

[10] Section 3-506 conceivably implicates constitutional rights other than free speech, but that is the only constitutional right advanced by Fusaro in these proceedings.

31

"totality" of a state's election laws in assessing the effect of a challenged provision thereof. *See* 415 U.S. at 737.

Our Court has likewise looked to the text of a challenged statute, its practical operation, and whether it is "facially neutral and nondiscriminatory," which — in this context — has generally referred to a statute that does not favor one political party or viewpoint over another. *See Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 713, 717 (4th Cir. 2016). We have also considered related precedents that shed light on the burden imposed by the challenged regulation. *See Greidinger v. Davis*, 988 F.2d 1344, 1352-54 (4th Cir. 1993) (consulting statutes and precedents regarding privacy protections for social security numbers in evaluating burden imposed by Virginia statute conditioning voter registration on disclosure of such numbers).

In sum, the severity of the burden imposed by an electoral regulation is a context-dependent inquiry. That inquiry may nevertheless be resolved on a motion to dismiss because its resolution generally depends on legal — rather than factual — sources and considerations. *See Alcorn*, 826 F.3d at 716-19 (assessing severity of burden imposed by election regulation on motion to dismiss by reference to legal sources). We will now apply that analysis to § 3-506.

b.

Considering the appropriate legal factors, we are satisfied that § 3-506 does not impose a severe burden on the First Amendment right to free speech in its regulation of the List. Consequently, strict scrutiny does not apply to Fusaro's claims.

32

Section 3-506 imposes four conditions on access to a copy of the List. Specifically, the requester must: be a registered Maryland voter; complete an application that requires providing a home address; pay a fee; and refrain from using the List for any purpose not related to the electoral process. *See* Md. Code Election Law, § 3-506(a), (c).[11] Importantly, § 3-505 also makes voter registration records available to the public at local State Board offices. Those records can be taken from a local office "for purposes of data processing," that is, to convert them into a more convenient format. *See id*., § 3-505(b)(2)(ii)(2). And § 3-505 does not place any restrictions on who may obtain voter registration data through the State Board offices, nor does it impose any fees on accessing the data by that means.

In assessing the burden imposed by those regulations — that is, by the combined effect of § 3-506 and § 3-505 — it is important to our analysis that obtaining a copy of the List is, as we have observed, a "step removed" from the communication of political speech. *See Kendall*, 650 F.3d at 525 (declining to apply strict scrutiny to Maryland Election Law provision specifying proper manner of signing referenda). The List itself does not convey any message or idea, and the limits placed on access to it do not directly impede the flow of information, particularly when — as discussed below — other means of communication remain open. That fact distinguishes § 3-506 from regulations limiting who may circulate, sign, or witness petitions, which have generally been made subject to

---

[11] Based on Fusaro's application for a copy of the List, it appears that the applicable fee to obtain such a copy in 2017 did not exceed $128, depending on the format and scope of the copy requested. *See* Complaint, Ex. C.

strict scrutiny. As the Supreme Court observed, regulations that "limit the number of voices who will convey the initiative proponents' message" directly reduces speech, as well as "the size of the audience proponents can reach." *See Am. Constitutional Law Found.*, 525 U.S. at 194-95. That concern does not apply to § 3-506, which only governs access to a particular tool for speech, and does not limit speech itself. Indeed, the petition process is a form of direct political participation and usually represents a unique avenue for public participation in policymaking. Access to the List, by contrast, is *several* steps removed from any such democratic participation. In short, the List remains a useful tool for communication but not a form of actual speech. A regulation on access to such a tool can merit First Amendment protection, but not necessarily heightened scrutiny. *See Kendall*, 650 F.3d at 525 (applying intermediate scrutiny to regulations on referendum signatures).

Another reason the courts distinguish between means of communication and pure speech is that one tool can often be substituted for another. Here, even absent a copy of the List, nothing prevents Fusaro from criticizing prosecutor Davitt on billboards, in newsletters, on the internet, or simply by mailing his letter to any Marylander in the phone book. By contrast, a petition initiative generally has no meaningful alternative to a boots-on-the-ground approach to gather signatures, particularly where electronic signatures do not satisfy a state's petition requirements. We have heretofore ruled that, when a plaintiff can avoid the restriction imposed by an election regulation, the plaintiff's right has not been burdened. *See Miller v. Brown*, 503 F.3d 360, 368 (4th Cir. 2007) (concluding that, because Virginia permitted multiple types of primary elections,

34

restrictions imposed on one type did not "burden parties' right of association"). Moreover, the information provided in the copies of the List available under § 3-506 is also available to any person who visits one of the twenty-four State Board offices, pursuant to the separate statutory provision in § 3-505. Thus, Fusaro need not register to vote in Maryland — or convince a registered voter to assist him — to obtain the information he seeks; he need only visit a State Board office during business hours.

It is true that the broad access to voter registration records under § 3-505 imposes the logistical burden of visiting a State Board office, in contrast to the ease with which § 3-506 provides copies of the List to registered Maryland voters. In context, however, we are satisfied that the burden imposed is not a severe one. First, a state is not constitutionally required to eliminate every logistical barrier in administering its regulatory regime for elections. *See, e.g.*, *Burdick*, 504 U.S. at 433 ("[T]he mere fact that a State's system creates barriers . . . tending to limit the field of candidates from which voters might choose . . . does not itself compel close scrutiny.") (internal quotation marks omitted). Most importantly, the challenged provisions of § 3-506 are politically neutral, a principal factor in assessing the burden imposed by an election regulation. *See id*. at 438 (emphasizing the validity of "reasonable, politically neutral regulations" in concluding that burden imposed by Hawaii regulation was "limited").

In the limited available precedents where conditions on access to voter information were deemed improper, the critical flaw in the challenged regulation has been that it was not politically neutral. *See Libertarian Party of Ind.*, 778 F. Supp. at 1459 (striking state statute providing copy of voter registration list only to major political

35

parties); *Socialist Workers Party*, 314 F. Supp. at 996 (same). We agree that such viewpoint discrimination — or other obviously illegitimate classifications, such as race — separates presumptively valid distinctions from presumptively unconstitutional restrictions in securing access to voter information. Indeed, our decision in *Alcorn* emphasized that political neutrality was important to determining whether a state election provision severely burdened First Amendment rights. *See* 826 F.3d at 717 (ruling that Virginia ballot-ordering law imposed only "modest burdens" because, importantly, it allowed "any political organization . . . an evenhanded chance" at "a first-tier ballot position").

The importance of political (or viewpoint) neutrality to determining the applicable level of scrutiny is bolstered by other relevant precedents. In *Anderson*, the Supreme Court emphasized that "it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *See* 460 U.S. at 793. In other words, an election regulation that plausibly burdens First Amendment rights on the basis of viewpoint, political affiliation, or class should be subject to strict scrutiny. *See, e.g.*, *Fulani v. Krivanek*, 973 F.2d 1539, 1544 (1992) (relying on *Anderson* and emphasizing that statutes that impose an "unequal burden" on "minor" parties can be "a significant infringement on First Amendment rights"). And in *United Reporting*, a central concern of the various justices writing separately was that, in controlling access to government information, states might impose conditions "based on an illegitimate criterion such as viewpoint." *See* 528 U.S. at 43 (Ginsburg, J., concurring). Thus, in the

36

context of First Amendment challenges to both election regulations and access to government information — the two central aspects of Fusaro's claims — the crucial line drawn by the Supreme Court was that the government could not use its power against disfavored positions or political groups.

The conclusion that the states may make certain legitimate, facially neutral distinctions between individuals seeking access to government voting data without triggering strict scrutiny accords with the approach taken by various courts in other contexts where the government is not merely a regulator. That is, where the government confers some affirmative benefit — rather than interfering with private conduct — it usually enjoys greater flexibility and a lower level of judicial scrutiny. This is true, for example, when the government creates a limited forum for speech. In those cases, the state may create "lawful boundaries," including some content-based distinctions, if such limits serve the purpose of the forum and avoid viewpoint discrimination. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995). The same reasoning applies when the government confers a subsidy, such as a tax benefit, where the legislature is free to support "some speech, but not all speech," as long as the subsidy "is not aimed at the suppression of dangerous ideas." *See Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 548-49 (1983) (internal quotation marks omitted). Justice Ginsburg analogized the disclosure of government information to a subsidy in her *United Reporting* concurrence. She observed that "the provision of [arrestee] address information is a kind of subsidy," so that while some selective

37

disclosure of that data was permissible, the state could not condition access on "an illegitimate criterion such as viewpoint." *See* 528 U.S. at 43.

The common thread of such precedents is the recognition that when the government is not compelled to provide a particular benefit, it may place limits on access to that benefit, as long as those limits do not cross a constitutional red line. Viewpoint discrimination is one such line, as the foregoing discussion makes clear. And it seems obvious that distinctions based on race, religion, or national origin would be similarly "illegitimate" criteria. *See United Reporting*, 528 U.S. at 43 (Ginsburg, J., concurring). And the Court's decision in *Anderson* emphasizes that the prohibition on viewpoint discrimination likewise renders suspect a regulation that places unequal burdens on different political parties. *See* 460 U.S. at 793.

In this situation, however, no illegitimate criteria are implicated by the text, context, or operation of § 3-506. The distinction between registered voters and non-registered voters may be subject to other types of constitutional challenges in some contexts, but here there is no apparent risk of impermissible government interference with speech. Indeed, we have sustained otherwise politically neutral electoral regulations that limited certain forms of political expression to registered voters. *See Kendall*, 650 F.3d at 525-26 (applying intermediate scrutiny to "nondiscriminatory" state petition signature regulation that limited potential signatories to registered voters); *Howlette v. City of Richmond*, 580 F.2d 704 (4th Cir. 1978) (upholding municipal regulation requiring that petition signatories swear they were qualified voters). As long as the path to becoming a registered voter is not tainted by discrimination, such distinctions do not

38

generally present a risk of political or viewpoint discrimination that would be presumptively unconstitutional.

Finally, we note that the sole content-based distinction in § 3-506 is similarly benign. The only reference to content in § 3-506 is the provision limiting use of the List to purposes "related to the electoral process." Similarly neutral restrictions on the use of arrestee addresses were sustained by the Supreme Court in *United Reporting*, where it rejected a facial challenge to the California statute barring commercial use of those addresses. *See* 528 U.S. at 40. At bottom, the limit that § 3-506 imposes on use of the List is politically neutral — that is, it does not distinguish between viewpoints, economic classes, or political affiliations — and thus avoids the critical danger that the government might unduly influence "competition in the marketplace of ideas." *See Anderson*, 460 U.S. at 794 (internal quotation marks omitted); *see also Alcorn*, 826 F.3d at 717 (emphasizing political neutrality of regulation in assessing burden it imposed).

c.

In sum, § 3-506 does not severely burden speech, nor does it raise any suspicion of improper government action. Consistent with at least six justices in *United Reporting*, we emphasize that the crucial consideration in assessing the propriety of a restriction on access to government information is whether it represents, or poses a substantial risk of, viewpoint discrimination. *See* 528 U.S. at 43, 46; *see also Turner Broadcasting*, 512 U.S. at 642 (emphasizing need for heightened scrutiny of laws posing a "substantial risk of excising certain ideas or viewpoints from the public dialogue"). In so doing, we also adhere to the controlling precedents emphasizing that when a court evaluates an electoral

39

regulation, political neutrality is a touchstone for assessing the burden imposed thereby. *See Burdick*, 504 U.S. at 438; *Alcorn*, 826 F.3d at 713, 717.

Certainly, other constitutional red flags may also trigger strict scrutiny in assessing the burden imposed by an election law under the first step of the *Anderson-Burdick* framework. Our conclusion that § 3-506 does not merit strict scrutiny depends on its limited practical effect on the free speech interest asserted by Fusaro, its political neutrality, and its underlying nature as a regulation on access to a government record. As we have emphasized herein, the fact that § 3-506 is both an election regulation and a means of accessing government information urges some judicial deference to the policy judgments it reflects. *See, e.g.*, *Burdick*, 504 U.S. at 433 (cautioning against applying strict scrutiny to all election laws and thereby "[tying] the hands of States" in regulating elections). In particular, the disclosure of government information is generally a decision that belongs to the political branches, and a court must exercise caution in interposing itself in such policy judgments. *See Houchins*, 438 U.S. at 14. That context weighs against subjecting § 3-506 to strict scrutiny, a standard that affords the least amount of deference to policymakers, and assumes that the challenged statute is unconstitutional.

Having concluded that § 3-506 does not merit strict scrutiny, we are satisfied to remand Fusaro's free speech claims for the district court to conduct the balancing of interests test required by the *Anderson-Burdick* framework. Such balancing could, on some occasions, be appropriate for resolution on appeal. *See Alcorn*, 826 F.3d at 719. We adhere, however, to the principle that the district court should have the first opportunity to perform the applicable analysis. *See, e.g.*, *Lovelace v. Lee*, 472 F.3d 174,

203 (4th Cir. 2006) (emphasizing that this Court is "a court of review, not of first view" and remanding issues for initial consideration by district court). Remand is particularly appropriate here because the defendant state officials have not yet articulated the state interests supporting § 3-506, as required for the *Anderson-Burdick* balancing analysis. *See id*. (explaining that remand was particularly appropriate given lack of development of relevant issues by defendants). Accordingly, we leave the balancing of Maryland's interests against Fusaro's free speech rights to the district court on remand.

B.

Lastly, we turn to the district court's dismissal of Fusaro's vagueness challenge and its denial of his requested preliminary injunction. The court did not directly address Fusaro's vagueness challenge to the phrase "electoral process," as it is used in § 3-506. Instead, the court determined that both counts of Fusaro's Complaint were premised on a First Amendment claim that simply did not exist, and it dismissed the entire Complaint on that basis. Similarly, the court rejected Fusaro's request for injunctive relief because he could not succeed on the merits. That is, because the court had concluded that Fusaro failed to state a cognizable First Amendment claim, he could not qualify for the "extraordinary remedy" of a preliminary injunction. *See* Opinion 27 (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

In light of our determination that Fusaro has successfully stated a First Amendment claim, we vacate the dismissal of his vagueness challenge and the denial of injunctive relief. We remand those issues for the district court to address in the first instance. *See Lovelace*, 472 F.3d at 203.

41

## IV.

Pursuant to the foregoing, we vacate the district court's dismissal of Fusaro's Complaint and the court's denial of injunctive relief. We remand for such other and further proceedings as may be appropriate.

*VACATED AND REMANDED*