**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-1162

LIBERTARIAN PARTY OF VIRGINIA; WILLIAM HAMMER; JEFFREY CARSON; JAMES CARR; MARC HARROLD; WILLIAM REDPATH; WILLIAM CARR; BO CONRAD BROWN; PAUL F. JONES,

Plaintiffs,

and

ROBERT C. SARVIS,

Plaintiff – Appellant,

v.

JAMES B. ALCORN, in his individual and official capacities as member of the Virginia State Board of Elections; SINGLETON B. MCALLISTER, in her individual and official capacities as member of the Virginia State Board of Elections; CLARA BELLE WHEELER, in her individual and official capacities as member of the Virginia State Board of Elections,

Defendants – Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Robert E. Payne, Senior District Judge. (3:14-cv-00479-REP)

Argued: May 10, 2016                    Decided: June 20, 2016

Before WILKINSON and AGEE, Circuit Judges, and DAVIS, Senior Circuit Judge.

Affirmed by published opinion. Judge Wilkinson wrote the opinion in which Judge Agee and Senior Judge Davis joined.

**ARGUED**: David I. Schoen, DAVID I. SCHOEN, ATTORNEY AT LAW, Montgomery, Alabama, for Appellant.  Stuart Alan Raphael, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.  **ON BRIEF:** Robert C. Sarvis, Alexandria, Virginia, Appellant Pro Se.  Mark R. Herring, Attorney General of Virginia, Rhodes B. Ritenour, Deputy Attorney General, Anna T. Birkenheier, Assistant Attorney General, Matthew R. McGuire, Assistant Attorney General, Erin R. McNeill, Assistant Attorney General, Trevor S. Cox, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.

WILKINSON, Circuit Judge:

Robert Sarvis, a political figure in the Libertarian Party of Virginia, brings a constitutional challenge to Virginia's three-tiered ballot ordering law. The district court found no merit in Sarvis's arguments and accordingly dismissed his challenge for failure to state a claim under Fed. R. Civ. P. 12(b)(6). We now affirm.

I.

Sarvis's attack focuses chiefly upon the ballot ordering law found in Virginia Code § 24.2-613. That law describes the form of ballot to be used in Virginia elections. It provides that for elections to "federal, statewide, and General Assembly offices" a candidate "shall be identified by the name of his political party" or by the term "Independent." Va. Code Ann. § 24.2-613. Of principal concern to this case, the law also orders the ballot for elections to these offices in three tiers.

The first tier includes candidates from "parties" or "political parties," which a related section of the Code defines as organizations of citizens that received at least 10 percent of the vote for any statewide office filled in either of the two preceding statewide general elections. Va. Code Ann. § 24.2-101. In addition, the Code provides that any organization seeking "party" or "political party" status must also have had a state central committee and an elected state chairman present in

3

Virginia for six months prior to any nominee from that organization filing for office. Id. The only organizations currently designated "parties" or "political parties" under the Code are the Republican Party and the Democratic Party.[1]

The second tier includes candidates from "recognized political parties." For an organization of citizens to be designated a "recognized political party" under the Code, that organization must have had a state central committee present in Virginia for six months prior to any nominee from that party filing for office, and the state central committee must be comprised of voters residing in each Virginia congressional district. Va. Code Ann. § 24.2-613. The organization must also have a duly elected state chairman and secretary as well as a party plan and bylaws. Id. The Libertarian Party of Virginia has been designated a "recognized political party" under the Code.

Finally, the third tier of the ballot includes "[i]ndependent candidates" not associated with "political parties" or "recognized political parties." Id.

In addition to delineating the election ballot's three tiers, Virginia's ballot ordering law also specifies how

---

[1] We note that as recently as the mid-1990s, the Virginia Reform Party satisfied the applicable requirements to be designated a "political party" and thus was part of the first-tier ballot listing on the 1996 general election ballot. Cf. J.A. 61, 95, and 97.

candidates are ordered within the three tiers. In the first two tiers, candidate order is set by lot. Importantly, this order is replicated for each office on the ballot, creating party order symmetry across the ballot as a whole. In the third tier, candidate order is alphabetical by surname. Id.[2]

In July 2014, just a few months before the November 2014 elections, Sarvis and others members of the Libertarian Party of Virginia along with the Libertarian Party of Virginia itself and one independent candidate filed a complaint that named as defendants certain members of the Virginia State Board of Elections. The complaint alleged that the three-tiered ballot ordering law found in Virginia Code § 24.2-613 violated their constitutional rights under the First and Fourteenth Amendments. Sarvis and his co-plaintiffs sought relief from the law prior to the November 2014 elections.[3]

---

[2] Somewhat different rules govern the tiered ballot used for elections for the offices of President and Vice President of the United States. See Va. Code Ann. §§ 24.2-543, -613, -614.

[3] The plaintiffs' amended complaint before the district court also targeted Virginia Code § 24.2-506, a law establishing a signature requirement some prospective candidates must meet to be placed on the ballot in the first place. However, the plaintiffs later voluntarily dismissed this claim at oral argument before the district court. Sarvis's appellate briefs reference the signature requirement, and it is thus unclear whether he is attempting to revive this claim on appeal. In any event, we will not consider this issue in light of the plaintiffs' decision to dismiss it below. See Unioil, Inc. v. E.F. Hutton & Co., 809 F.2d 548, 555 (9th Cir. 1986) ("As a general rule, a plaintiff may not appeal a voluntary dismissal (Continued)

5

In September 2014, the plaintiffs and the Commonwealth both determined that the litigation would not be resolved prior to the November 2014 elections. But the parties and the district court agreed that, should Sarvis and his co-plaintiffs intend to seek elected office in the future, their case would remain ripe beyond the November 2014 elections under the capable of repetition yet evading review doctrine. The plaintiffs thus amended their complaint to reflect their interest in seeking relief from the ballot ordering law with regard to future elections, and the litigation continued on this basis. Sarvis in particular alleged that he would be "a candidate for national office in Virginia in the 2016 election." J.A. 32. The amended complaint asked that the district court enjoin the law during the "2015 statewide elections and the 2016 and beyond general elections" and issue "an order directing the defendants to assign ballot positions to all ballot-qualified candidates and parties on a random basis without regard to party status." J.A. 46.

Shortly thereafter, Virginia filed a motion to dismiss under Rule 12(b)(6), claiming that the amended complaint failed to state a claim upon which relief could be granted. The

because it is not an involuntary adverse judgment against him."), overruling on other grounds recognized by In re Keegan Mgmt. Co., 78 F.3d 431, 435 (9th Cir. 1996).

district court granted Virginia's motion to dismiss in January 2015. Sarvis v. Judd, 80 F. Supp. 3d 692, 695 (E.D. Va. 2015). The district court based its decision primarily on the framework established by the Supreme Court in Burdick v. Takushi, 504 U.S. 428 (1992), and Anderson v. Celebrezze, 460 U.S. 780 (1983). In those decisions, the Supreme Court held that courts should review First and Fourteenth Amendment-based challenges to state election laws by weighing the severity of the burden the challenged law imposes on a person's constitutional rights against the importance of the state's interests supporting that law. Burdick, 504 U.S. at 434; Anderson, 460 U.S. at 789.

Sarvis and his co-plaintiffs, the Commonwealth of Virginia, and the district court all agreed that the burden imposed by the three-tiered ballot ordering law was not severe enough to warrant strict scrutiny. The district court gave two principal reasons for this conclusion. First, the law is politically neutral in that it does not entrench particular political parties in favorable positions on the election ballot. Sarvis, 80 F. Supp. 3d at 701-02. Second, the law does not exclude any prospective candidate from the ballot altogether. Id. at 702-03.

Turning to the question of Virginia's interests, the district court noted three justifications offered by Virginia for the ballot ordering law: avoiding voter confusion, creating party-order symmetry, and favoring parties with demonstrated

7

public support. Id. at 703. Before assessing the merits of these justifications, however, the district court determined that Virginia had described the nature and purpose of the three justifications with sufficient precision. Disagreeing with the plaintiffs, the district court held that neither additional factual development of the case nor more concrete empirical support for Virginia's justifications was necessary before it could properly rule on Virginia's motion to dismiss. Id. at 703-06. The district court then reviewed Virginia's three justifications and determined that each was important. Id. at 706-08.

Finally, in weighing the plaintiffs' burdens against Virginia's interests, the district court ruled that the interests put forward by Virginia outweighed any minor burdens the ballot ordering law imposed on Sarvis and his co-plaintiffs. The district court accordingly granted Virginia's motion to dismiss the amended complaint. Id. at 708-09. Sarvis alone appeals that order.

## II.

Sarvis's main argument on appeal is that Virginia's three-tiered ballot ordering law advantages candidates from what he calls "major parties" and disadvantages candidates like him that hail from what he calls "minor parties." According to Sarvis, this conferral of advantages and disadvantages violates

8

expressive and associational rights, the right to cast a vote for a candidate of one's choice, and the right to stand for election, all of which are protected by the First Amendment. In addition, Sarvis contends that the ballot ordering law's unequal treatment of candidates runs afoul of the Fourteenth Amendment's Equal Protection Clause. Appellant's Opening Br. 12-13.

Sarvis premises his constitutional challenge largely on what the district court termed the "windfall vote" theory. Sarvis, 80 F. Supp. 3d at 699. According to this theory, in any given election, some voters will vote for candidates appearing at the top of the ballot because of those candidates' prominent ballot positions. Sarvis argues that Virginia's ballot ordering law, in conjunction with this capricious voter bias, places an improper burden on candidates from minor parties. Before the district court, however, Sarvis stated that his expert would not testify about the exact extent of the bias in Sarvis's specific situation. Id. at 700 n.1.

Although he concedes that the burden imposed by the three-tiered ballot ordering law is not subject to strict scrutiny, Sarvis contends that the district court's Anderson/Burdick analysis nevertheless underestimated the magnitude of the burden imposed by the law. At the same time, he argues that the court's analysis over-credited the interests Virginia offered to support the law.

Finally, in addition to disagreeing with the substance of the district court's analysis of the burdens imposed and interests furthered by the ballot ordering law, Sarvis argues that the district court erred in rejecting his claims at the motion to dismiss stage. He states that the district court should have allowed discovery so as to better ascertain how the ballot ordering law burdens candidates who are not listed in the ballot's first tier, and how it does or does not actually further the interests Virginia offers in support of the law.

## III.

We begin with the uncontroversial proposition that the legislature in each state of our federal system possesses the presumptive authority to regulate elections within that state's sovereign territory. This authority stems directly from the Constitution. With regard to congressional elections, Article I Section 4 Clause 1 of the Constitution provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." Article II Section 1 Clause 2 accords similar treatment to presidential elections: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors," who will then choose the President. And a state's

authority to regulate elections for its own offices is simply a basic incident of our federal system. The Constitution nowhere confers – at least not as an initial matter – authority on the federal government to regulate elections for state offices.

These constitutional provisions are the product of the Framers' extensive debate concerning the roles that the state and federal governments would play in regulating elections. See, e.g., The Federalist No. 59 (Alexander Hamilton) (arguing for federal control over congressional elections); The Anti-Federalist No. 7 (Cato) (arguing for state control over congressional elections). It is no surprise that the precise compromise that the Framers struck differs for each type of election. For instance, the Framers chose to "invest[] the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices." Arizona v. Inter Tribal Council of Arizona, Inc., 133 S. Ct. 2247, 2253 (2013) (quoting Foster v. Love, 522 U.S. 67, 69 (1997)). With regard to presidential elections, however, the Framers adopted a different approach: the Electoral College. They then gave state legislatures the authority to decide the manner through which the electors from each state would be appointed. McPherson v. Blacker, 146 U.S. 1, 35 (1892).

11

Of course, the Reconstruction Amendments along with later amendments such as those providing for the election of Senators "by the people" (1913) and prohibiting denial of the right to vote "on account of sex" (1920) materially altered the division of labor established by the Framers for the regulation of elections. U.S. Const. amends. XVII, XIX. And various federal statutes, most notably the Voting Rights Act of 1965, passed pursuant to those amendments have made still further alterations. Most of these steps were deeply necessary and long overdue. Through them all, however, the Constitution has continued to preserve for state legislatures the presumptive authority to regulate both the larger and smaller aspects of the federal and state elections occurring within that state's boundaries.

Indeed, the Supreme Court has consistently recognized this enduring tenet of our constitutional order, noting that the states possess a "broad power to prescribe the Times, Places and Manner of holding Elections for Senators and Representatives, which power is matched by state control over the election process for state offices." Clingman v. Beaver, 544 U.S. 581, 586 (2005) (quoting Tashjian v. Republican Party of Conn., 479 U.S. 208, 217 (1986)); see also Bush v. Palm Beach Cty. Canvassing Bd., 531 U.S. 70, 76 (2000) (per curiam) (noting

12

state legislatures' broad power over the appointment of presidential electors).

This arrangement is not only long-standing – it also makes a certain sense. All other things being equal, it is generally better for states to administer elections. It is true that smaller units of government can act oppressively toward minority citizens within their borders and against unpopular points of view. But local administration also allows for greater individual input and accountability; a distant bureaucracy is in danger of appearing out of reach and out of touch. Even Alexander Hamilton, who vigorously supported greater federal control over congressional elections, acknowledged the point: allowing "local administrations" to regulate elections "in the first instance" may, "in ordinary cases," be "more convenient and more satisfactory." The Federalist No. 59. All of this is to say that a lot of thought stretching over centuries has gone into our electoral system as it now generally operates. The text and history of the Constitution, well established Supreme Court precedent, and the structural principles inherent in our federal system counsel respect for the Virginia General Assembly's power to administer elections in Virginia.

IV.

A.

13

Mindful of state legislatures' longstanding authority to regulate elections, we turn first to an examination of the alleged burdens imposed by Virginia's three-tiered ballot ordering law.

State election regulations often "implicate substantial voting, associational and expressive rights protected by the First and Fourteenth Amendments." Pisano v. Strach, 743 F.3d 927, 932 (4th Cir. 2014) (citation omitted). "The First Amendment, as incorporated against the states by the Fourteenth Amendment, protects the rights of individuals to associate for the advancement of political beliefs and ideas." S.C. Green Party v. S.C. State Election Comm'n, 612 F.3d 752, 755-56 (4th Cir. 2010). For example, it is "beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." Anderson, 460 U.S. at 787 (quoting NAACP v. Alabama, 357 U.S. 449, 460 (1958)). "[I]nvidious" classifications also violate rights protected by the Equal Protection Clause of the Fourteenth Amendment. Williams v. Rhodes, 393 U.S. 23, 30 (1968). These rights, however, are not absolute. All election laws, including perfectly valid ones, "inevitably affect[] – at least to some degree – the

14

individual's right to vote and his right to associate with others for political ends." Anderson, 460 U.S. at 788.

In order to distinguish those laws whose burdens are uniquely unconstitutional from the majority of laws whose validity is unquestioned, we employ the Supreme Court's Anderson/Burdick decisional framework. We "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate"; "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed"; and "determine the legitimacy and strength of each of those interests" and "the extent to which those interests make it necessary to burden the plaintiff's rights." Anderson, 460 U.S. at 789. This balancing test requires "hard judgments" – it does not dictate "automatic" results. Id. at 789-90.

The nature of our inquiry is "flexible" and "depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." Burdick, 504 U.S. at 434. Laws imposing only "modest" burdens are usually justified by a state's "important regulatory interests." S.C. Green Party, 612 F.3d at 759. Laws imposing "severe" burdens, on the other hand, "must be 'narrowly drawn to advance a state interest of compelling importance.'" Burdick, 504 U.S. at 434 (citation

15

omitted). They are thus subject to "strict scrutiny." <u>McLaughlin v. N.C. Bd. of Elections</u>, 65 F.3d 1215, 1221 (4th Cir. 1995). However, the class of laws facing this higher scrutiny is limited. Subjecting too many laws to strict scrutiny would unnecessarily "tie the hands of States seeking to assure that elections are operated equitably and efficiently." <u>Burdick</u>, 504 U.S. at 433.

Here, Virginia's three-tiered ballot ordering law imposes only the most modest burdens on Sarvis's free speech, associational, and equal protection rights. The law is facially neutral and nondiscriminatory – neither Sarvis's Libertarian Party nor any other party faces a disproportionate burden. All parties are subject to the same requirements. None are automatically elevated to the top of the ballot. Virginia's ballot ordering law thus allows any political organization - of any persuasion – an evenhanded chance at achieving political party status and a first-tier ballot position. Va. Code Ann. §§ 24.2-101, -613.

Sarvis complains that the bar for achieving first-tier political party status is nonetheless too high, but he exaggerates the difficulty of this goal. An organization may obtain first-tier political party status if <u>any</u> of its candidates for <u>any</u> office receives 10 percent of the vote in <u>either</u> of the two preceding statewide general elections. And, in

16

any case, his complaint is inapposite because he may be present on the ballot in all events. Sarvis did appear on the ballot in the past, and he may do so again in the future. What is denied, therefore, is not ballot access, but rather access to a preferred method of ballot ordering. But mere ballot order denies neither the right to vote, nor the right to appear on the ballot, nor the right to form or associate in a political organization.

Comparing this relaxed regime with statutes upheld in other cases demonstrates that Virginia's ballot ordering law imposes only a minimal burden on First and Fourteenth Amendment rights. For example, in Munro v. Socialist Workers Party, the Supreme Court considered the constitutionality of a Washington state law requiring that "a minor-party candidate for partisan office receive at least 1% of all votes cast for that office in the State's primary election" in order even to appear on the general election ballot at all. 479 U.S. 189, 190 (1986). The Court upheld the law, because Washington "ha[d] not substantially burdened the 'availability of political opportunity.'" Id. at 199 (citation omitted). Other cases have found that a complete prohibition on write-in voting imposed only "very limited" burdens on constitutional rights, Burdick, 504 U.S. at 437, and that a law barring candidates from appearing on the ballot as candidates of more than one political party "does not severely

17

burden" associational rights. <u>Timmons v. Twin Cities Area New Party</u>, 520 U.S. 351, 359 (1997). Indeed, the Court has even held that a state may prohibit independent candidates from appearing on the ballot if they "had a registered affiliation with a qualified political party" during the previous year. <u>Storer v. Brown</u>, 415 U.S. 724, 726-28 (1974). Viewed in the light of these regulations, Sarvis's squabbles with his particular position on the ballot appear almost inconsequential. The ballot ordering law does not deny anyone the ability to vote for him, nor his ability to appear on the Virginia ballot with his preferred party affiliation.

Sarvis himself recognizes the limits of the ballot ordering law's burdens, as he concedes that this case "does not rise to a level of strict scrutiny." J.A. 183-84. He nonetheless maintains that the law "creates a serious consequential burden," because "[c]andidates in inferior ballot positions have a strong likelihood of getting fewer votes than they would otherwise" under the theory of windfall voting. Appellant's Opening Br. 3. The theory is that uninformed or undecided voters are more likely to choose candidates listed higher on the ballot. In Sarvis's view, Virginia's ballot ordering law thus grants an advantage to candidates from major political parties, and determining the magnitude of this advantage requires that the

18

case "go forward on the merits for the development of a full factual record." Appellant's Opening Br. 13.

Sarvis's demand for discovery, however, misapprehends the nature of a motion to dismiss. Here, the district court properly recognized that "[t]o survive a Rule 12(b)(6) motion to dismiss, a complaint must 'provide enough facts to state a claim that is plausible on its face,'" Sarvis, 80 F. Supp. 3d at 696 (quoting Robinson v. Am. Honda Motor Co., 551 F.3d 218, 222 (4th Cir. 2009)), and that to reach facial plausibility, Sarvis must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

The problem for Sarvis is that even if there is a windfall vote, his complaint would still fail to raise the "reasonable inference" that Virginia's ballot ordering law creates constitutionally significant burdens. The fact remains that, "windfall" or not, the Virginia ballot ordering law still does not "restrict access to the ballot or deny any voters the right to vote for candidates of their choice." Sonneman v. State, 969 P.2d 632, 638 (Alaska 1998). The law instead "merely allocates the benefit of positional bias, which places a lesser burden on the right to vote." Id. And contrary to Sarvis's cursory equal protection argument, Appellant's Opening Br. 12-13, it makes

19

this allocation in a neutral, nondiscriminatory manner. Compare Graves v. McElderry, 946 F. Supp. 1569, 1582 (W.D. Okla. 1996) (holding that an Oklahoma law placing Democratic Party candidates in the highest ballot positions violated the Equal Protection Clause), with Bd. of Election Comm'rs of Chicago v. Libertarian Party of Ill., 591 F.2d 22, 25-27 (7th Cir. 1979) (holding that an Illinois county's facially neutral two-tiered ballot ordering system did not violate the Equal Protection Clause).

It remains far from clear, moreover, that federal courts possess the power to rule that some voters' choices are less constitutionally meaningful than the choices of other supposedly more informed or committed voters. This whole windfall vote theory casts aspersions upon citizens who expressed their civic right to participate in an election and made a choice of their own free will. Who are we to demean their decision? "There is 'no constitutional right to a wholly rational election, based solely on a reasoned consideration of the issues and the candidates' positions, and free from other 'irrational' considerations.'" Schaefer v. Lamone, No. 1:06-cv-00896-BEL, 2006 U.S. Dist. LEXIS 96855, at *13 (D. Md. Nov. 30, 2006) (quoting Clough v. Guzzi, 416 F. Supp. 1057, 1067 (D. Mass. 1976), aff'd, 248 F. App'x 484 (4th Cir. 2007). As noted, Sarvis says that his expert would not testify as to the exact degree of

positional bias caused by Virginia's law, but this admission is unnecessary to our analysis. "[A]ccess to a preferred position on the ballot so that one has an equal chance of attracting the windfall vote is not a constitutional concern." New Alliance Party v. N.Y. State Bd. of Elections, 861 F. Supp. 282, 295 (S.D.N.Y. 1994). Even without Sarvis's admission, the windfall vote theory would thus fail to raise an inference of any cognizable constitutional burden on First or Fourteenth Amendment rights.

Given that the Virginia ballot ordering law does not restrict candidate access to the ballot or deny voters the right to vote for the candidate of their choice, or otherwise require strict scrutiny, we have no need to conduct the kind of empirical analysis into burdens that would essentially displace the authority of state legislatures with the views of expert witnesses. That is not to say, however, that our analysis is at an end. In order to be sure that the district court did not improperly dismiss Sarvis's complaint, we need to make certain that important state interests support Virginia's ballot ordering law.

B.

Virginia's three-tiered ballot ordering law is supported by "important regulatory interests." Timmons, 520 U.S. at 358. In particular, the law may assist the voting process by reducing

21

voter confusion and preserving party-order symmetry across different offices on the ballot. Additionally, the law may also reduce multi-party factionalism and promote political stability.

Sarvis again insists that we may not weigh these interests without discovery. Appellant's Opening Br. 20. But "elaborate, empirical verification of [] weightiness" is not required. Timmons, 520 U.S. at 364. To hold otherwise would "invariably lead to endless court battles" over the quality of the state's evidence, Munro, 479 U.S. at 195, and to a corresponding loss of certainty over the rules by which we select our whole government. We therefore do not "require that a state justify" reasonable and nondiscriminatory rules "in this manner." Wood v. Meadows, 207 F.3d 708, 716 (4th Cir. 2000). In cases where strict scrutiny does not apply, we ask only that the state "articulate[]" its asserted interests. Id. at 717. This is not a high bar, and Virginia has cleared it here. Reasoned, credible argument supports its stated interests.

First, Virginia's three-tiered ballot ordering law serves the important state interest of reducing voter confusion and speeding the voting process. While Sarvis's complaint is vague about how his preferred ballot listing would actually operate, J.A. 46, it is clear that he wishes to move ballot ordering among parties and candidates to a more purely random system. Virginia's system, by contrast, emphasizes voter familiarity and

22

more predictable order. Listing candidates by party allows voters to more quickly find their preferred choice for a given office, especially when party loyalties influence many voters' decisions. And in an environment where many voters not only hold party loyalties but also tend to be loyal to one of only a few major parties, it again aids the voting process to list candidates from those parties first on the ballot. Sarvis's request for a court decree commanding Virginia to randomly order its ballot betrays not only a flawed conception of federal judicial power. It is also suspect as a practical matter. Random ordering risks requiring voters to decipher lengthy multi-office, multi-candidate ballots in order to find their preferred candidates.

"Election officials have good reason to adopt a ballot format that minimizes" this sort of "confusion." Bd. of Election Comm'rs of Chicago, 591 F.2d at 25. For each extra minute that a voter spends deciphering his ballot in the voting booth, dozens or more voters may spend another minute in line. This all adds up. Long election lines may frustrate voters attempting to exercise their right to vote. Hour long lines at some polling locations have led many to complain that election officials had discouraged their exercise of the franchise. See, e.g., Fernanda Santos, In Arizona, Voters Demand: Why the Lines?, N.Y. Times,

March 25, 2016, at A13. Reducing the risk of this sort of disincentive is undoubtedly an important state interest.

Second, and relatedly, Virginia's ballot ordering law also has the advantage of maintaining party-order symmetry across many offices on the ballot. Within the first two ballot tiers, party order is determined by lot. Va. Code Ann. § 24.2-613. The names of all party-affiliated candidates for particular offices then appear "in the order determined for their parties." Id. This is so for all "federal, statewide, and General Assembly offices." Id.

The effect of all this is to create "a symmetrical pattern on the ballot." New Alliance Party, 861 F. Supp. at 297. The ballot law ensures that if a party's candidate for United States Senator is listed second, for example, then candidates from that party will be second in lists for other offices as well. This again advances the state's interest in "efficient procedures for the election of public officials." S.C. Green Party, 612 F.3d at 759. It makes the ballot more easily decipherable, especially for voters looking for candidates affiliated with a given party.

Finally, the ballot ordering law may also favor Virginia's "strong interest in the stability of [its] political system[]." Timmons, 520 U.S. at 366. "Maintaining a stable political system is, unquestionably, a compelling state interest." Eu v. S.F. Cty. Democratic Cent. Comm., 489 U.S. 214, 226 (1989). While

24

minor parties have long been an important feature of political protest and American democratic life, it is also entirely legitimate for states to correlate ballot placement with demonstrated levels of public support. Indeed, there are many who believe that "the emergence of a strong and stable two-party system in this country has contributed enormously to sound and effective government." Davis v. Bandemer, 478 U.S. 109, 144-45 (1986) (O'Connor, J., concurring).

The Constitution therefore unsurprisingly "permits [a state legislature] to decide that political stability is best served through a healthy two-party system," Timmons, 520 U.S. at 367, as opposed to shifting coalitions of multiple party entities. Of course, state latitude in this regard is not unlimited. While a state legislature may not "completely insulate the two-party system from minor parties' or independent candidates' competition and influence," it may "enact reasonable election regulations that may, in practice, favor the traditional two-party system," and "temper the destabilizing effects of party-splintering and excessive factionalism." Id.

Structuring ballot order to prefer parties already strong enough to reach first-tier party status under the Virginia Code may further this stabilizing goal. In Sarvis's view, after all, a windfall vote of some magnitude is inevitable. Assuming this is true, some party or candidate will benefit. Some party or

candidate has to be listed first. But Virginia's ballot ordering law ensures that at least the beneficiary will not be some entity with little actual public support. Of course, we acknowledge that the two major parties may possess a self-interest in preserving their preferred status, but we will not leap from that fact to the conclusion that a requirement of demonstrated public support is somehow inimical to the public good. Reinforcing through facially neutral and nondiscriminatory methods affiliations already democratically expressed by large portions of the public simply does not offend the Constitution.

V.

Having identified the asserted state interests furthered by Virginia's three-tiered ballot ordering law, we must at last weigh them against the law's burdens on the plaintiff's First and Fourteenth Amendment rights. Burdick, 504 U.S. at 434. Here our job is easy – this case is one of the "usual[]" variety in which the "State's important regulatory interests . . . justify reasonable, nondiscriminatory restrictions." Timmons, 520 U.S. at 358 (citation and internal quotation marks omitted).

The three-tiered ballot ordering law imposes little burden on Sarvis's constitutional rights, and Virginia articulates several important interests supporting the law. In these circumstances, we have "no basis for finding a state statutory scheme unconstitutional." Wood, 207 F.3d at 717. We leave

26

further resolution of this controversy to a different and better set of arbiters: the people, and through them, the political branches.

<u>AFFIRMED</u>
