STATE OF MAINE
KENNEBEC, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-20-29

DCCC and DSCC,
    Plaintiffs

v.

**DECISION ON MOTION FOR
PRELIMINARY INJUNCTION**

MATTHEW DUNLAP
Maine Secretary of State,
    Defendant

## INTRODUCTION AND PROCEDURAL HISTORY

This matter is before the court on the Plaintiffs' Motion for a Preliminary Injunction seeking to enjoin the Secretary of State from utilizing the provisions of Maine's Ballot Order Statute (21-A M.R.S. §601(2)(B)), in the upcoming general election to be held in November 2020. The Plaintiffs contend that 21-A M.R.S. §601(2)(B), which requires the names of candidates on the ballot to be arranged alphabetically with the last name first, is invalid under the United States and Maine Constitutions.

The Plaintiffs are the DCCC and the DSCC. They are, respectively, the national congressional and senatorial committees of the Democratic Party. *See* 52 U.S.C. §30101(14). The missions of these Plaintiffs are the election of Democratic candidates to the United States House of Representatives and the Unites States Senate.

On February 21, 2020, the Plaintiffs commenced this action challenging the constitutional validity of 21-A M.R.S. §601(2)(B) on the ground that it arbitrarily and illegally grants ballot order preference to those candidates whose last names begin with a letter early in the alphabet. In this particular case, the Plaintiffs allege

that, as a result of section 601(2)(B), incumbent Senator Susan Collins has an unfair and illegal advantage over presumed Democratic candidate Speaker of the House Sara Gideon solely on the basis that her last name begins with a letter earlier in the alphabet. Similarly, the Plaintiffs maintain that, as a result of the statute, incumbent Congressman Jared Golden will suffer an unfair and illegal disadvantage solely on the basis that his last name begins with a letter later in the alphabet than his potential Republican opponents (Adrienne Bennet, Eric Brakey or Dale Crafts). The Plaintiffs also contend that the ballot ordering statute unlawfully grants an advantage to those candidates for the State House of Representatives and Senate whose names appear earlier in the alphabet.

The complaint filed by the Plaintiffs seeks declaratory and injunctive relief and asserts causes of action pursuant to 42 U.S.C. §1983 and the First and Fourteenth Amendments to the United States Constitution (Count I), and 5 M.R.S. §4682 and Article I, section 6-A of the Maine Constitution (Count II).[1]

On March 10, 2020, the Plaintiffs moved for a preliminary injunction. That motion and incorporated memorandum of law was supported by: the affidavit of Lucinda Guinn, Executive Director of DCCC (Exhibit A); the affidavit of Sara Schaumburg, Director of Voter Protection and Deputy Policy Director of DSCC (Exhibit B); the expert report of Dr. Barry C. Edwards, J.D., Ph.D. of the University of Central Florida (Exhibit C), and; miscellaneous articles identified as Exhibits D, E and F.

---

[1] The Plaintiffs acknowledge that the Law Court has held that a cause of action for a violation of the Maine Constitution must allege that the enjoyment of a state constitutional right has been interfered with by physical force or violence or the threat thereof. *See Andrews v. Dept. of Envtl. Prot.,* 716 A.2d 212 (Me. 1998). Nevertheless, the Plaintiffs have asserted a cause of action under the Maine Constitution in order to preserve their right to challenge this state law precedent on appeal.

The Secretary of State filed a timely answer on March 17, 2020, it which he denied that Maine's ballot ordering statute is unconstitutional and challenged the standing of the Plaintiffs to bring their claims. He also raised lack of ripeness as an issue. On April 29, 2020, the Secretary of State filed his opposition to the motion for preliminary injunction, supported by the Affidavit of Julie L. Flynn, Deputy Secretary of State and Exhibits 1-3 and A.

On May 11, 2020, the National Republican Senatorial Committee moved for leave to file a brief as *Amicus Curiae* in support of the Secretary of State's opposition to the motion for preliminary injunction. That motion was granted, without objection, on May 20, 2020. The focus of the *Amicus* brief is the contention that: (a) Plaintiffs lack standing; (b) this case presents a non-justiciable political question, and; (c) the court should not involve itself in potentially altering the ballot order for an upcoming general election, resulting in voter confusion, on the basis of *Purcell v. Gonzalez*, 549 U.S. 1 (2006).

The Plaintiffs submitted reply memoranda in support of its motion for preliminary injunction and in response to the *Amicus* brief on May 21, 2020. The reply memorandum was supported by the supplemental expert report of Dr. Edwards (Exhibit A). Oral argument was held on May 27, 2020.

**FACTUAL BACKGROUND AND CONTEXT**

The alleged factual basis of the Plaintiffs' claim that 21-A M.R.S. §601(2)(B) is unconstitutional is the contention that placement of a candidate's name first on the ballot will give that candidate an advantage because of the "primacy effect," i.e., "the first option is selected more often than other choices are." *Edwards Report at 4*. In the context of elections, this concept or phenomenon is sometimes referred to as the "windfall vote" or the "donkey vote." The theory here is that some voters will be influenced in casting their votes by the placement of the candidates' names on the ballot, and the first name listed will have a "distinct advantage." *Id.at 5*.

Relying on research conducted of Ohio's' elections, in which ballot positions were rotated from precinct to precinct, Dr. Edwards has offered the opinion that the "ballot order will increase the first listed candidate's vote share in Maine's 2020 U.S. Senate Election by 1.5 – 2.0 percentage points." *Id. at 6.* Further, Dr. Edwards states: "It is my opinion that ballot order effects will give the first listed candidate in Maine's 2020 U.S. House races a 2 percentage point advantage." *Id. at 8.* Regarding state legislative elections, Dr. Edwards opines that "ballot order effects will give the first listed candidates in races in the Maine Senate and Maine House a 3.0 pecentage point advantage in vote share." *Id. at 10.* Dr. Edwards also maintains, based on his own research, that "early alphabet names are overrepresented in Maine's legislature compared to Maine's general population," and he seems to attribute this to Maine's alphabetical ballot ordering statute. *Id. at 14-15.* Dr. Edwards' report concludes with his observation that "the state's arbitrary ballot ordering method undermines the integrity of the state's election results, distorts the voters' will, and is unfair to minority populations." *Id. at 19.*

Dr. Edwards does acknowledge, however, that the magnitude of the "ballot order effect" is highly dependent "on how much attention the race receives from voters. In very high-profile races, the ballot order effect is slight and can be difficult to detect with statistical certainty." *Id. at 6.*

The Secretary of State challenges Dr. Edwards' opinions and the certainty of his statistical predictions as to the effect the ballot order will have in the 2020 general elections, particularly the election for the U.S. Senate seat currently held by Senator Collins and the House of Representatives seat held by Congressman Golden. The Secretary of State, pointing to some of the research studies relied upon by Dr. Edwards, also questions whether the views expressed by him actually represent the consensus views of most social scientists who have considered the subject of ballot ordering. Indeed, in his Supplemental Report, Dr. Edwards appears to acknowledge

that some scholars in the field "have not detected statistically significant ballot order effects, and they have argued that ballot order effects do not alter many election outcomes," but he disagrees with those scholars. *Supplemental Report at 3.* Finally, the Secretary of State emphasizes that, notwithstanding Dr. Edwards' professed certainty in the effects ballot ordering will have in any of the 2020 election races, his opinions are speculative to some extent because other research has shown that the "primacy effect" may occur in some races and not in others.

In his Supplemental Report, Dr. Edwards contends that the Secretary of State has misinterpreted and misunderstood both his prior research and the statistical significance of his findings and those of other researchers who have studied ballot order effect.

In pointing out the obvious, the court would note that in the context of this motion for a preliminary injunction, the evidence is entirely on paper and has not been subjected to cross-examination of any kind. At this stage, however, the court can make some initial observations, after having reviewed both reports prepared by Dr. Edwards, the literature he has cited that has been presented to the court by the Secretary of State, and the well-written memoranda of the parties and *Amicus.*

First, for purposes of the Plaintiffs' Motion for Preliminary Injunction, the court accepts that there is a phenomenon known as the "primacy effect" or "ballot order effect" in elections whereby some members of the electorate may cast their votes for a candidate for the sole reason that the name of the candidate is listed first on the ballot.

Second, the court is hesitant to accept the proposition that the "primacy effect" occurs in every election in any significant way because each election is unique in its own way, and studies have purported to show that the primacy effect may occur in some elections and not in others.

Third, predictions that purport to quantify what the primacy effect will be in any given election should be viewed with caution because studies seeking to measure such an effect are attempting to uncover whether a voter cast a vote, in the privacy of the voting booth, solely because a candidate was listed first on the ballot.

Fourth, Dr. Edwards' prediction that the November 2020 election for the U.S. Senate in Maine will see a ballot order effect of 1.5 -2.0 percentage points is viewed with some measure of suspicion by this court, in light of the unprecedented and extraordinary level of political advertising that has already taken place in that race.

Fifth, based on the limited preliminary injunction record, the court is somewhat skeptical of Dr. Edwards' apparent suggestion that the alphabetical make-up of the Maine Legislature is attributable to the alphabetical ballot ordering statute found in 21-A M.R.S. §601(2)(B).

## Is This Controversy Ripe?

The Secretary of State has suggested that the Plaintiffs' claims are not ripe for judicial review by this court because the primary elections have not been held and will not be held until July 14, 2020. The Law Court has described "ripeness" in the following way: "Ripeness is a two-pronged analysis: (1) the issues must be fit for judicial review, and (2) hardship to the parties will result if the court withholds review." *Blanchard v. Town of Bar Harbor*, 2019 ME 168, ¶ 20, 221 A.3d 554. To be fit for judicial review, there must be a genuine controversy involving a concrete and immediate legal dispute, as opposed to a hypothetical problem. *Clark v. Hancock Cty. Commrs.*, 2014 ME 33, ¶ 19, 87 A.3d 712; *Hathaway v. City of Portland*, 2004 ME 47, ¶ 11, 845 A.2d 1168.

In the court's view, the fact that the primary elections have not been held does not mean that the Plaintiffs' claims are not ripe. At least with regard to the U.S. Senate and House of Representatives elections, the potential candidates are known and the order of the candidates on the general election ballot can easily be

determined by reference to section 601(2)(B). Moreover, delaying any action on the Plaintiffs' Motion for a Preliminary Injunction until after July 14, will likely cause hardship to the parties because it will greatly compress the time within which they may seek further judicial review while the general election approaches and ballots need to be printed.

Accordingly, the court concludes that the Plaintiffs' claims are ripe for judicial review.

## Do The Plaintiffs Have Standing?

In his answer to the Plaintiffs' complaint, the Secretary of State raised the Plaintiffs' lack of standing to bring this action as a defense, but in his opposition to the motion for preliminary injunction, the Secretary of State only addressed the Plaintiff's alleged lack of standing with respect to state legislative elections. Specifically, the Secretary of State asserts that the Plaintiffs, by law, are the committees of the Democratic Party on the national level and have no mission or purpose regarding state level races. At oral argument, the Secretary of State made it clear that he was not conceding the Plaintiffs' standing with respect to federal elections. *Amicus Curiae* National Republican Senatorial Committee, on the other hand, has directly challenged the Plaintiffs' standing to bring this suit on the basis of a recent decision from the Eleventh Circuit Court of Appeals involving these very Plaintiffs. *See Jacobson v. Fla. Sec'y*, 2020 U.S. App. LEXIS 13714 (11ᵗʰ Cir. 2020).

The Law Court has instructed that Maine's standing jurisprudence is "prudential, rather than constitutional" because our state constitution does not contain a "case or controversy" requirement. *Roop v. City of Belfast*, 2007 ME 32, ¶ 7, 915 A.2d 966. "The gist of the question of standing is whether the party seeking review has a sufficient personal stake in a justiciable controversy to assure the existence of that concrete adverseness that facilitates diligent development of the

legal issues presented." *Halfway House, Inc. v. City of Portland*, 670 A.2d 1377, 1380 (Me. 1996).

There is not a fixed "formula" for deciding standing in Maine and courts look to the gravamen of the complaint to make that determination. *Roy v. City of Augusta*, 414 A.2d 215, 217 (Me. 1980); *Walsh v. City of Brewer*, 315 A.2d 200, 205 (Me. 1974). Because Maine's approach to standing is somewhat flexible, it can have "a plurality of meanings." *Walsh*, 315 A.2d at 205. Nevertheless, as a general proposition a plaintiff must have a sufficient direct and personal concrete injury distinct from that of the pubic at large. *Buck v. Town of Yarmouth*, 402 A.2d 860, 861 (Me. 1979). A mere generalized interest in a problem is not enough to confer standing. The particularized injury must be sufficiently concrete and definite – not hypothetical or speculative. *Varney v. Look*, 377 A.2d 81, 83 (Me. 1977).

Another form of standing, referred to as "associational standing" may apply where an organization claims that its members or any one of them are suffering immediate or threatened harm as a result of the challenged action, which would allow the members to have standing. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975). *See also Conservation Law Found. v. LePage*, 2018 Me. Super. LEXIS 156, *16-17 (CUM-CV-18-45, July 20, 2018) (Horton, J.).

Here, the Plaintiffs are the statutorily recognized national committees of the Democratic Party. The overriding missions of these Plaintiffs is the election of Democratic candidates to public office, most particularly, but not necessarily exclusively, to the United States Senate and House of Representatives. The complaint they have brought seeks a declaration, with injunctive relief, that Maine's ballot order statute is unconstitutional because it systematically and arbitrarily disadvantages candidates whose last names begin with a letter later in the alphabet.

In *Jacobson v. Fla. Sec'y* a three-member panel of the 11th Circuit Court of Appeals held that these Plaintiffs in that case lacked direct or associational standing

to challenge Florida's ballot order statute. The Court ruled that DCCC and DSCC had failed to identify any of its members who had or would suffer an injury and, further, that they had not explained how it would be directly injured by a diversion of its resources. 2020 U.S. App. LEXIS 13714* 23-28.

Utilizing Maine's more flexible standing jurisprudence, the court concludes that the Plaintiffs have a sufficiently concrete and direct stake in this challenge to the ballot order statute to allow them to continue with this action. Moreover, the court is satisfied that the Plaintiffs have associational standing as well.[2]

## THE PRELIMINARY INJUNCTION STANDARD

A party seeking injunctive relief by a temporary restraining order or a preliminary injunction has the burden of demonstrating to the court that four criteria are met. The moving party must demonstrate that: (1) it has a likelihood of success on the merits (at most, a probability; at least, a substantial possibility); (2) it will suffer irreparable injury if the injunction is not granted; (3) such injury outweighs any harm which granting the injunctive relief would inflict on the other party; and (4) the public interest will not be adversely affected by granting the injunction. *Bangor Historic Track, Inc. v. Dep't of Agric., Food & Rural Res.*, 2003 ME 140, ¶ 9, 837 A.2d 129.

The court does not consider these criteria in isolation, but weighs them together to determine whether injunctive relief is appropriate to the specific circumstances of the case. *Dep't of Envtl. Prot. V. Emerson*, 563 A.2d 762, 768 (Me. 1989). Nevertheless, "[f]ailure to demonstrate that any one of the criteria is met requires that injunctive relief be denied." *Bangor Historic Trtack, Inc.*, 2003

---

[2] The court has considered the additional arguments advanced by *Amicus* National Republican Senatorial Committee that this case presents a non-justiciable pollical question and that *Purcell v. Gonzalez* counsels against the court becoming involved in a matter affecting an election. The court is not persuaded that it should refrain from addressing the Plaintiffs' claims for those reasons.

ME 140, ¶ 10. It has been observed that "historically, the Maine courts have taken a conservative attitude towards injunctions, holding the injunction to be 'an extraordinary remedy only to be granted with utmost caution when justice urgently demands it and the remedies at law fail to meet the requirements of the case.'" *Saga Communs. of New England, Inc. v. Voornas*, 2000 ME 156, ¶ 19, 756 A.2d 954 *quoting* Andrew H. Horton & Peggy L. McGehee, MAINE CIVIL REMEDIES § 5.1, at 5-2 to 5-3 (1991).

## Likelihood of Success on the Merits

Title 21-A M.R.S. §601 addresses the subject of the preparation of election ballots. Among other things, it directs the Secretary of State to prepare the ballot in a uniform and consistent manner, and requires that the ballot contain instructions to the voter as to how to designate the voter's choice on the ballot. The ballot itself "must contain the legal name of each candidate, without any title, and municipality or township of residence of each candidate, <u>arranged alphabetically with the last name first, under the proper office designation.</u>" 21-A M.R.S. §601(2)(B). On the general election ballot, "the party or political designation of each candidate must be printed with each candidate's name." *Id.* It is the statutory requirement that candidate names be arranged in alphabetical order, last name first, that the Plaintiffs assert is violative of the First and Fourteenth Amendments to the United States Constitution.

The Plaintiffs' claim that section 601(2)(B) is unconstitutional must be evaluated in light of the familiar principle that "all acts of the Legislature are presumed constitutional." *Bouchard v. Dep't of Pub. Safety*, 2015 ME 50, ¶ 8, 115 A.3d 92. One who claims that a statute is unconstitutional has a "heavy burden" of showing that there "are no circumstances in which it would be valid." *State v. Weddle*, 2020 ME 12, ¶ 12, 224 A.3d 1035 *quoting Conlogue v. Conlogue*, 2006 ME 12, ¶ 5, 890 A.2d 691.

Moreover, in the particular context of this challenge to the validity of Maine's ballot order statute, the United States Constitution expressly grants to the Legislature the authority to prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives," subject to the power of Congress to regulate in this area. U.S. Const. Art. I, § 4, Cl. 1. Although the United States Supreme Court has not directly considered the validity of a state ballot order law, the parties appear to agree that the analysis this court must employ is articulated in *Burdick v. Takushi*, 504 U.S. 428 (1992) and *Anderson v. Celebrezze*, 460 U.S. 780 (1983), commonly referred to as the *Burdick/Anderson* standard of review.

In *Anderson*, the Court reaffirmed that state election laws can burden two separate, but overlapping, rights, namely, the right to associate to advance political beliefs and the right of voters to effectively cast their votes. 460 U.S. at 783 *quoting Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968). While recognizing that these rights are "fundamental," the Court also pointed out that not all restrictions imposed by state election laws "impose constitutionally suspect burdens on voters' rights." *Id*. This is so because "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). Accordingly:

> To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes. Each provision of these schemes, whether it governs the registration and qualification of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects – at least to some degree – the individual's right to vote and his right to associate with others for political ends. Nevertheless, the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.

460 U.S. at 788.

There is no "litmus paper" test to distinguish valid from invalid election law restrictions. Rather, the *Anderson* Court described a process by which a court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments." Next, "the precise interests put forward by the State as justifications for the burden imposed by its rule," must be identified and evaluated. As part of this calculus, a court must not only assess the "legitimacy and strength" of the State's interests, but also "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* at 789.

In *Burdick*, the Court rejected the suggestion that every voting regulation be subjected to a strict scrutiny analysis, requiring that the regulation be narrowly tailored to advance a compelling governmental interest. To insist that state election regulations meet such a high standard "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." 504 U.S. at 433. Rather, under the standard explicated in *Anderson,* the level of scrutiny depends upon the extent to which First and Fourteenth Amendment rights are burdened.

> Thus, as we have recognized when those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' But when a state election law provision imposes only 'reasonable nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions.

*Id.* at 434.

The parties to this litigation agree that the *Burdick/Anderson* standard of review calls for a "sliding scale" analytical process. In applying this analysis to the Plaintiffs' challenge to 21-A M.R.S.§ 601(2)(B), the court has reviewed a significant volume of caselaw addressing the constitutional legality of various ballot ordering statutes. For a description of the many different methods used by states to =order

their ballots, *see Jacobson v. Fla. Sec'y*, 2020 U.S. App. LEXIS 13714, *49 (Pryor, Wm, J., concurring). Some of the ballot order cases were decided before *Burdick* or *Anderson,* others were decided after those cases, and still others were decided on state constitutional grounds.

One of the cases relied upon by the Plaintiffs is *Akins v. Sec'y of State*, 904 A.2d 702 (N.H. 2006), where the New Hampshire Supreme Court analyzed that state's ballot order law under an uncommon state constitutional provision that guarantees to every inhabitant "an equal right to be elected into office." N.H. Const., pt. I, Art. 11. The court used the *Burdick/Anderson* sliding scale and applied it to New Hampshire's law that required the first column on the ballot to be reserved to the party that received the most total votes in the last general election, and the Secretary of State's practice of listing the party's candidates within the column by alphabetical order.

The court found that the statute, as well as the practice of alphabetical listing of names, deprived candidates of the equal right to be elected, because it denied minority party candidates "an equal opportunity to enjoy the advantages of the primacy effect," and had a similar effect on candidates whose last names were not near the beginning of the alphabet. 904 A.2d at 707. The court acknowledged that its ruling was based on New Hampshire's special constitutional provision, which is "one not shared by most states." *Id.* at 708.

Likewise, in *Kautenburger v. Jackson,* 333 P.2d 293, 295 (Ariz. 1958), the Arizona Supreme Court invalidated, on state equal protection grounds, a law that required alphabetical listing of names in primary elections when voting machines were used, but not otherwise.

In *Gould v. Grubb*, 14 Cal.3d 661, 536 P.2d 1337 (1975), the Supreme Court of California found that state's "incumbent first" ballot ordering statute violative of equal protection and also held that listing candidate names in alphabetical order was

equally invalid. The court employed a strict scrutiny analysis and found that the state could not demonstrate a compelling governmental interest in the alphabetical order procedure, which granted an advantage to candidates whose names appear earlier in the alphabet. 14 Cal. 3d at 674-75.

The Plaintiffs have also emphasized the significance of the Supreme Court's summary affirmance in *Mann v. Powell*, 333 F.Supp. 1261 (N.D. Ill. 1969), *aff'd*, 398 U.S. 955 (1970), but this court's reading of that decision suggests that it was a relatively narrow one. *Mann v. Powell* involved an Illinois law that assigned ballot position in primary elections based on when the candidate filed nominating petitions. Ties were broken by the secretary of state or other official. The secretary of state for Illinois at the time (Powell) had made public statements that he intended to break ties by doing what he had done in the past, namely, favor incumbents, those with "seniority," or those with whom he was personally acquainted. A prior injunction had been issued against him for doing just that. *See Weisberg v. Powell*, 417 F.2d 388 (7ᵗʰ Cir. 1969). In *Mann v. Powell*, the court actually upheld the validity of the statute but, nevertheless, issued an injunction against the secretary of state and ordered him to break ties by drawing lots. This case appears to have more to do with the secretary of state's continuing attempts to play favorites by awarding the top ballot positions to friends and associates.

The court has also examined several other cases that have invalidated state ballot order laws, although not necessarily ones that were based on the alphabet. *See McLain v. Meier*, 637 F.2d 1159, 1167 (8ᵗʰ Cir., 1980) (incumbent first law does not withstand rational basis standard of review – pre-*Burdick/Anderson*); *Graves v. McElderry*, 946 F. Supp. 1569, 1579 (W.D. Okla.,1996) (Democrat first, Republican second ballot position law invalid because "windfall" votes cause dilution of votes "cast by more careful or interested voters . . . ."); *Holtzman v. Power,* 313 N.Y.S.2d 904 (Sup. Ct.), *aff'd,* 311 N.Y.S.2d 824 (App. Div., 1970) (incumbent first followed

by others by lot failed rational basis test – pre-*Burdick/Anderson*). *See also Jacobson v. Lee*, 411 F.Supp.3d 1249 (N.D. Fla., 2019) (ballot order law based on which party won the last election for governor held to be unconstitutional under *Burdick/Anderson*), *vacated on other grounds, Jacobson v. Sec'y.*, 2020 U.S.App.LEXIS 13714 (11ᵗʰ Cir., 2020).[3]

On the other hand, there are a variety of cases that have rejected constitutional challenges to ballot order laws.

In *Schaefer v. Lamone*, the court upheld the validity of Maryland's law requiring that candidates be listed alphabetically. Employing the rational basis analysis, the court rejected an equal protection claim that the statute violated the rights of "high" surname candidates. The court also analyzed the statute under the *Burdick/Anderson* sliding scale standard of review to determine whether it violated the right to vote. The court first observed that the alphabetical listing of candidates does not prevent anyone from voting or from gaining access to the ballot. The only harm alleged was that some percentage of undecided and/or uninterested voters would vote for someone else based solely on ballot position. But the court found this "harm" of no constitutional significance.

Finally, even assuming there was some constitutional harm or burden, the court found that the state's interests outweighed that burden and was compelling because it served the goals of presenting a manageable, easily understood ballot that prevented voter confusion. 2006 U.S.Dist.LEXIS 96855 (D. Md., 2006) *aff'd*, 248 F.App'x 484 (4ᵗʰ Cir. 2007), *cert. denied,* 552 U.S. 1313 (2008).

In *Sarvis v. Alcorn*, the court considered Virginia's ballot ordering law, which structures the ballot into three tiers. Tier one is for "political parties" as defined.

---

[3] Interestingly, in *Jacobson v. Lee*, 411 F.Supp.3d at 1284, the District Court expressed the view that arranging candidate names in alphabetical order would alleviate any burden on First and Fourteenth Amendment rights because it would cleanse "the partisan taint from the process."

Tier two is for "recognized parties," as defined. Tier three is for "independent candidates." Within the first two tiers, the candidate order is established by lot. In tier three, however, the candidate order is set alphabetically by surname. The argument advanced by the plaintiff was that this ballot order scheme burdened the rights of minority candidates based on the "windfall" vote effect.

The court applied the *Burdick/Anderson* standard of review, and noted that Virginia's ballot ordering law did not deny access to the ballot, "but rather access to a preferred method of ballot ordering. But mere ballot order denies neither the right to vote, nor the right to appear on the ballot, nor the right to form or associate in a political organization." 826 F.3d 708, 717 (4ᵗʰ Cir., 2016), *cert. denied,* 137 S.Ct. 1093 (2017). The court described the burden on constitutional rights as "most modest," "minimal," and "almost inconsequential." *Id.*

In addressing the "windfall" vote or primacy effect theory of a constitutional injury, the court was emphatic that even if the "windfall" vote phenomenon existed, the ballot order law did not affect the right to ballot access or the right to vote. "This whole windfall vote theory casts aspersions upon citizens who expressed their civic right to participate in an election and made a choice of their own free will. Who are we to demean their decision?" *Id.* at 718.

Finally, the court was satisfied that Virginia's ballot ordering law was supported by "important regulatory interests," including the reduction or prevention of voter confusion. *Id.* at 719.

Likewise, in *New Alliance Party v. New York Bd. of Elections,* 861 F.Supp. 282 (S.D.N.Y., 1994), the court upheld a law whereby party candidates were positioned first on the ballot in descending order based on the party's performance in the last gubernatorial election. Independent bodies followed the parties and the order of those candidates was arranged by lot. The court held that "access to a preferred position on the ballot so that one has

an equal chance of attracting the windfall vote is not a constitutional concern. Indeed, it should not be. The Constitution does not protect a plaintiff from the inadequacies or the irrationality of the voting public; it only affords protection from state deprivation of a constitutional right." *Id.* at 295.

Utilizing the *Burdick/Anderson* analysis, the court found "no" injury to the plaintiff's constitutional rights. Moreover, the court found that the statute rationally and reasonably served the state's "compelling need to construct and order a manageable ballot and prevent voter confusion." *Id.* at 297.

Other courts have upheld state ballot ordering statutes against constitutional attacks. *See Clough v. Guzzi*, 416 F.Supp. 1057 (D. Mass., 1976) (incumbent first followed by others in alphabetical order meets rational basis test – pre-*Burdick/Anderson*); *Ulland v. Growe*, 262 N.W.2d 412 (Minn.), *cert. denied sub nom., Berg v. Growe,* 436 U.S. 927 (1978) (party candidates first, independents next, meets rational basis test – pre-*Burdick/Anderson*).

Having considered the relevant caselaw and the written and oral arguments of the parties, the court finds that the Plaintiffs have failed to meet their burden of demonstrating a substantial likelihood of success on the merits. At this stage of the proceedings, the Plaintiffs have not shown that any burden on First and Fourteenth Amendment rights is likely to be significant. On the contrary, Maine's ballot ordering statute does not deny the right to vote, does not deny access to the ballot and does not deny the right to associate with or form a political organization.

Moreover, the state's important regulatory interest in an orderly, clearly understood ballot arrangement is strong. Listing candidates alphabetically facilitates voter understanding and reduces voter confusion. And it does so it a reasonable, neutral and non-discriminatory fashion. To the extent the

Plaintiffs are suggesting that 21-A M.R.S. § 601(2)(B) discriminates against those candidates with names later in the alphabet, the court does not believe that alphabetizing candidates on the ballot constitutes discrimination against a suspect class. *Schaefer v. Lamone*, 2006 U.S. Dist. LEXIS 96855, *5, *aff'd*, 248 F. App'x 484.

While rotation of ballot positions or assigning ballot positions randomly are certainly permissible methods of arranging the ballot, they are not the only methods permitted by the Constitution. The court also recognizes that rotation of ballot positions on many ballots (perhaps hundreds) throughout the State, would require a significant administrative expense and could increase voter confusion by undermining the efficacy of sample ballots. *See Sonneman* v. State, 969 P.2d 632, 639-40 (Alaska, 1998); *Tsongas v. Secretary of Commonwealth*, 291 N.E.2d 149, 156 (Mass., 1972).

Ultimately, what particular ballot ordering system should be employed in Maine is a judgment reserved by the United States Constitution to the Legislature. *Sonneman*, 969 P.2d at 639; *Ulland v. Growe*, 416 N.W.2d at 418; *Clough v. Guzzi*, 416 F.Supp. at 1067. The Plaintiffs have not met their burden of proving that they are likely to succeed in demonstrating that the Legislature's choice, as reflected in 21-A M.R.S. § 601(2)(B), is unconstitutional.

### Irreparable Harm

For the reasons already explained, the court finds that the Plaintiffs have not demonstrated that they will suffer irreparable harm if the preliminary injunction does not issue. Maine's ballot ordering law does not prevent anyone from voting; does not prevent anyone from gaining access to the ballot, and; does not prevent anyone from forming or joining a political organization. It simply arranges the names of the candidates on the ballot in

alphabetical order. In the court's view, the Plaintiffs have not shown that such an arrangement causes them irreparable harm.

## Balancing the Harms

Issuing a preliminary injunction would cause significant harm to the State and the public by throwing into doubt and uncertainty how the November 2020 ballot will be arranged. This is particularly true now when the Maine Legislature, the constitutional department of state government with the exclusive responsibility to decide the manner in which the ballot should be ordered, is not in session and it is nuclear when it will come back into session given the persistence of the coronavirus pandemic. The issuance of a preliminary injunction at this stage would likely expose the State to significant additional costs as it plans for the general election in November. Balanced against these real harms is what the court perceives at this point to be minimal, if any, injury to the Plaintiffs' constitutional rights.

## The Public Interest

What has already been said addresses the importance of the public interest in leaving 21-A M.R.S. § 601(2)(B) in place and not disrupting, through a preliminary injunction, the ballot ordering procedure that has been used in Maine for at least almost six decades.

## CONCLUSION

The entry is:

The Plaintiffs' Motion for a Preliminary Injunction is DENIED.

The clerk is directed to incorporate this order into the docket by reference pursuant to M.R. Civ. P. 79(a).

Date: June 11, 2020

William R. Stokes
Justice, Superior Court